[Civ. No. 19095. Second Dist., Div. Three. June 29, 1954.]

KEANS, SPRINGMANN AND STIPEK, INCORPORATED, Appellant, v. ALPHONZO E. BELL CORPORATION, Respondent.

Leonard Horwin and Krystal & Paradise for Appellant.

Overton, Lyman, Prince & Vermille, Donald H. Ford and Carl J. Schuck for Respondent.

WOOD (Parker), J.—The complaint is titled, "Complaint for Specific Performance of Contract and to Enforce a Trust and Accounting and, in the Alternative, for Damages and for Other Relief." Plaintiff sought a decree as follows: declaring that defendant holds in trust for plaintiff ½ of 1 per cent of all oil and gas produced from certain land under a leasehold interest of defendant; compelling defendant to perform a certain agreement, set forth in the complaint, by conveying to plaintiff an overriding royalty interest; requiring defendant to account for receipts from said royalty interest; or, in the alternative, for damages. Judgment was for defendant. Plaintiff appeals.

Plaintiff corporation, which is licensed as a real estate broker and as an oil and gas broker, is in the business of obtaining oil leases for oil companies. Defendant corporation is in the oil production business.

On October 13, 1947, Rodman Cross, an independent consulting geologist, and defendant entered into a written agreement whereby defendant employed Cross for six months to render services of a geologic nature for defendant with respect to land designated by defendant—it being understood that Cross would make available for defendant 50 per cent of his time, and that Cross would be permitted to devote his other time in behalf of himself or others in developing areas of potential oil land. On March 15, 1949, defendant and Cross agreed to modify said agreement as to the matter of compensation.

In the early part of 1948 oil was discovered in the Cuyama Valley, which is in Santa Barbara and San Luis Obispo Counties. The valley covers an area that is approximately 10 miles wide and 30 miles long.

In June, 1948, the Humble Oil Company employed plaintiff to determine what lands in the Cuyama Valley were not leased for oil production and to acquire oil leases thereon. Thereupon, pursuant to that employment, Ray Stipek, vice president of plaintiff, and several employees of plaintiff, made an investigation of that valley for approximately three months. During that time Stipek and the employees investigated, and negotiated for the lease of, the Johnston property which was about 10 miles southeast of the discovery well and in an area later known as the South Cuyama Field. The Johnston property consisted of two parcels—in one parcel there were about 325 acres, and in the other about 160 acres. In November, 1948, Mr. Johnston indicated to plaintiff that he would be willing to lease his land to the Humble Oil Company for $25 an acre a year; but Stipek refused the offer because, at that time, the oil company was not interested in the property.

On March 18, 1949, Cross went to the office of plaintiff and told Stipek that he (Cross) was interested in having plaintiff examine lands, in three designated sections of the area that later became the South Cuyama Field, for the purpose of determining the availability of such lands for oil leases. Stipek replied that plaintiff was available for that assignment, and that plaintiff had done work in that area. Then Stipek brought out a map and some of plaintiff's records covering that area. He told Cross that substantial portions of those lands were under lease to Richfield Oil Company, but it appeared that the Johnston land was open. Cross inquired as to the basis upon which plaintiff would undertake the work, and he (Cross) suggested that the work be done upon the same basis that plaintiff was then doing work in the Santa Cruz area, in which area Cross was interested. Stipek replied that plaintiff would do the work for its out-of-pocket expenses, which covered $25 a day, plus travelling and living expenses and 10 per cent interest in any benefits accruing to Cross or his client. Cross told Stipek (on Friday, March 18) to go to Cuyama Valley and see if he could get a three-year lease on the Johnston land for $10 an acre a year, and then to check plaintiff's records as to the availability of other lands. Cross said that he would be in

Santa Maria the following Monday (March 21) and that Stipek could reach him there regarding further investigation of such lands. Cross then wrote upon a piece of paper, as follows: "Cuyama Valley (1) Obtain names and addresses of lessors in . . . [description of three sections] (2) Lease the E. L. Johnston property as described: . . . [description of Johnston land] (3 yr. lse, 1st yr. pd. $10.00/ac, 1/8, 90 days between wells & offsetts, 330' offset, 10 ac. spacing.)." That writing was then delivered to Stipek. Stipek testified that Cross did not say anything about representing a principal; and that Cross stated that the leases were to be taken in plaintiff's name as lessee. Stipek also testified that Cross advised him that the leases were for an undisclosed principal. Cross testified that the undisclosed principal was not the defendant.

After that Friday and before the following Monday, Stipek checked plaintiff's records regarding the availability of other lands, and on Monday he telephoned Cross at Santa Maria and told him that the only lands available were the Johnston lands. In that telephone conversation, Cross told Stipek to proceed with the employment. The next day Stipek went from Los Angeles to the Johnston land, and in the evening of that day or the morning of the following day he told Mr. and Mrs. Johnston that plaintiff had a client who was interested in leasing the Johnston land for three years at $10 an acre a year and one-eighth royalty. Mr. Johnston said that the offer was of no interest to him, because he had a better offer from a Bakersfield concern. Mr. Johnston did not state the name of the concern but said that its offer was $25 an acre and one-eighth royalty. He also said that the offer was open for his acceptance until the end of March; that, in order for plaintiff to obtain a lease from him, plaintiff would have to meet those terms; he expressed confidence in plaintiff. Stipek said that he would develop the matter further with plaintiff's client and get in touch with Mr. Johnston later.

Stipek returned to Los Angeles, and on March 24 he telephoned Cross (at Santa Maria) and said that he had contacted Mr. Johnston and that Mr. Johnston had a pending offer from a Bakersfield concern for a lease for $25 an acre and that the offer was open for acceptance until the end of March; and that he (Stipek) believed that the term was for three years and that the royalty was one-eighth. According to the testimony of Stipek, Cross told Stipek to await

further instructions. According to the testimony of Cross, he did not say anything to Stipek about waiting for further instructions; and at that time he was not acting on behalf of defendant.

About March 28, Cross telephoned Mr. Bell, president of defendant corporation, and "went into the matter of the Johnston property" for the defendant, and told him that the property was available for $25 an acre. Then (on March 28 or 29) Cross went to the office of Bell and they discussed the Johnston property. He told Bell that Stipek had said that the Johnstons had an offer from a Bakersfield concern for $25 an acre and one-eighth royalty. Cross also told Bell that an oil well (later known as Homan well) was about to be drilled. Bell told Cross that he was willing to pay $25 an acre for the property. Cross urged Bell to have Stipek approach the Johnstons for a lease on the property. Within a day or two after that conversation, Bell told Cross to tell plaintiff to contact Johnston and try to obtain a lease for $25 an acre and one-eighth royalty. The Homan well, which was about 1½ miles from the Johnston land, was spudded in on April 2.

On Friday, April 8, Cross went to the office of plaintiff and asked Stipek and Keans (an officer of plaintiff) if plaintiff would be available to attempt again to get a lease on the Johnston land. Cross said that the Bell Corporation (defendant) was interested in getting a lease on the property for $25 an acre a year and one-eighth royalty, and that the lease was to be for defendant. He asked Stipek as to the basis upon which plaintiff would perform the work. Stipek replied that he thought it should be similar to the terms under which plaintiff had done previous work for defendant in the Santa Ynez Valley, which would be out-of-pocket expenses including $25 a day and travelling and living costs and one per cent overriding royalty. According to the testimony of Stipek, Cross said that defendant would object to paying plaintiff more than ½ of 1 per cent overriding royalty; Stipek then suggested ½ of 1 per cent overriding royalty, and Cross assented thereto but stated that he wanted to confirm it with Bell. Then the representatives of plaintiff went out of the room, and Cross telephoned Bell and told him that plaintiff would expect a fee of 1 per cent overriding royalty plus $25 a day. After said telephone call, Cross told Stipek that the arrangement was agreeable with Bell.

On the morning of April 9, 1949, Stipek went to the John-

ston ranch. Johnston told him that he had signed a lease with Stansbury, Inc., that the lease was for a term of three years for $25 an acre and one-eighth royalty, and that the lease was in escrow at the Bank of America at Santa Maria. Stipek then (April 9) telephoned Cross at Long Beach and told him that the Johnston property had been leased to Stansbury, Inc., a drilling contractor in Bakersfield, and that the lease was for $25 an acre and one-eighth royalty and was for a term of three years. According to the testimony of Stipek, Cross then told him "to return to Los Angeles and await further instructions." According to the testimony of Cross, Stipek asked Cross what he should "do now," and Cross replied that if defendant "wanted anything done further" that either he (Cross) or Bell would contact Stipek.

The following day (April 10) Cross telephoned Bell and reported the information which he had obtained from Stipek in said telephone conversation. Cross told Bell, at that time, that he thought the Johnston property should be obtained if possible, and that he (Cross) should see whether Stansbury, Inc., would assign its lease to defendant corporation.

After that conversation Cross went to Bell's office, and Bell suggested that Cross go to Stansbury, Inc., in Bakersfield and see if a deal could be made with it. On the following morning (April 11), Cross went to the office of Stansbury, Inc., in Bakersfield and asked Bert and Curly Stansbury if they were willing to make a deal on the Johnston property. They replied that they were willing to make a deal if the terms were correct. Curly then left the office. After further negotiations at that time, Bert said that it was agreeable with him to assign the lease on the parcel of 325 acres for $50 an acre and one-sixth royalty. Cross telephoned Bell from the Stansbury office and reported the conversation which he had with Bert Stansbury, and Bell replied that the terms were satisfactory with him. Cross told Bell that he should have his attorney prepare an assignment immediately. Cross then told Bert that Bell had approved the deal. On April 12, defendant's attorney prepared an assignment of the lease and, after talking with the attorney for Stansbury, Inc., mailed the assignment to Stansbury, Inc. That proposed assignment recited a consideration of $16,250 and a royalty of 4-1/6 per cent. On April 18, defendant's attorney talked with the attorney for Stansbury, Inc., and on April 19 defendant's attorney redrafted the assignment and sent copies of it to Stansbury's Inc.

On April 20 about midnight, Cross received information regarding "interesting showings" that were developed in drilling the Homan well. About 6 a. m. he telephoned Bell and told him that he had received a reliable report that the Homan well had cored oil sand. On April 22, defendant's attorney sent another copy of the assignment to the attorney for Stansbury, Inc. On April 25, Cross, Bell, and defendant's attorney went to Bakersfield to try to get the Stansburys to execute the assignment. At a meeting in the office of the Stansburys, the Stansburys (three brothers, Bert, Curly, and Milton) said that they had heard the news about the Homan well and that they could get a lot more for their lease now— they wanted to wait until the well was on production before they made a deal. The various proposed assignments, above referred to, were not executed.

On May 4, 1949, the Homan well produced oil. On May 6, Cross, Bell, and defendant's attorney went to Bakersfield and met the Stansburys. At that time the defendant and Stansbury, Inc., entered into an agreement whereby Stansbury, Inc., assigned a part of the Johnston lease, namely, 245 acres to defendant corporation for $121,875 and a royalty of 12½ per cent. (This was a part of the parcel of 325 acres previously involved in their negotiations.) The agreement also provided that defendant would drill a well within 90 days. Defendant's attorney prepared the agreement in the office of the Stansburys. On said day the assignment was signed by the Stansburys, Bell wrote a check for $121,875, and "the deal was closed."

On June 14, 1949, the defendant and the Stansburys entered into negotiations relative to an assignment of the remainder of the Johnston lease to defendant. (The remainder covered 240 acres—being the remaining 80 acres of the first parcel and the 160 acres in the second parcel.) On June 27, said remainder of the lease was assigned to defendant by the Stansburys for $100,000 and a royalty of 17½ per cent.

After April 9 (when Stipek told Cross that the Johnston land had been leased), and during the time defendant was obtaining the assignments from Stansburys, Cross and Stipek had various conversations regarding other transactions, such as the Santa Cruz matter and the Temblor leases, but nothing was said respecting the Johnston land transaction. About April 29, Cross asked Mr. Keans, an officer of plaintiff, to submit bills for the employments on March 18 and April 8. On April 29, plaintiff sent a bill to Cross for services from

March 21 to March 23. That bill for $112.07 was paid by Cross. On June 9, plaintiff sent a bill to defendant for services on April 8 and 9 in negotiating for an oil lease on the Johnston land. That bill for $96.75 was paid by defendant corporation. There was no reference in those bills to "stand-by instructions."

After the Stansburys had information that cores from the Homan well showed good oil sands, they tried to sell their Johnston lease. Also other companies, which were associated with the Stansburys in acquiring the Johnston lease, tried to sell the lease. Those companies were Crown Drilling Company and Hoover Drilling Company. Also one Bender, who had an interest in the lease, tried to sell it. Offers to sell or offers to buy the lease were made to or received from several oil companies, including Standard Oil, Union Oil, Superior Oil, Humble Oil, and General Petroleum. It thus appears that it was generally known that the Johnston land had been leased to the Stansburys and that the lease might be purchased from the Stansburys if their purchase price demands were met.

Stipek testified that about the middle of June, 1949, he learned that the lease on the Johnston property had been assigned to defendant. On July 15, 1949, plaintiff sent a letter to defendant in which it was stated that while plaintiff was awaiting further instructions regarding a lease on the Johnston land it learned that defendant had acquired the leasehold rights on the Johnston property, and that "As you elected to conclude such negotiations yourself for the Johnston lands, we assume that it is your intention to convey to us an undivided ½ of 1 per cent overriding royalty interest therein pursuant to our understanding." On July 19, 1949, defendant replied thereto by letter stating that plaintiff was never retained or requested by defendant to negotiate with Stansbury, Inc., for an assignment of the lease, and that defendant therefore rejected plaintiff's claim.

The court made findings, as shown in the following 12 paragraphs:

On April 8, 1949, plaintiff and defendant entered into an oral agreement under which plaintiff was to act as defendant's broker (a) to negotiate for an oil and gas lease with the owners of the Johnston property; and (b) to obtain from the owners an oil and gas lease of all the property. It was agreed therein that said lease should contain the following provisions: the name of defendant as lessee; the period within

which drilling operations must be commenced to be three years; the term of the lease to be so long after said three-year period as oil or gas or other hydrocarbon substances are produced from the property; the rental to be $25 per acre per year; and the landowner's royalty to be 12½ per cent of all production of oil and gas. Such oral agreement also provided that, for the services rendered by plaintiff in attempting to negotiate such a lease, defendant would pay $25 a day and would reimburse plaintiff for all out-of-pocket expenses, and if plaintiff obtained such a lease from the owners of said property on the terms thereinabove found to have been authorized by defendant, the defendant would, in addition, convey to plaintiff an overriding royalty of ½ of 1 per cent of all production of oil and gas.

Plaintiff did not perform any of the things to be performed by it under the said oral agreement of April 8, 1949, except that it did attempt to negotiate for an oil and gas lease on said property but was unable to obtain such lease. Plaintiff did not at any time state to defendant that it stood ready to negotiate for a leasehold interest in said property from Stansbury, Inc., and plaintiff did not at any time stand ready to so negotiate. Defendant did not, on April 9, 1949, or at any other time, give plaintiff any order that it should await further instructions from defendant, or that plaintiff should do anything further for defendant in connection with obtaining any assignment to defendant of any interest under either lease to Stansbury, Inc. The employment of plaintiff by defendant under said oral agreement terminated on April 9, 1949. About June 9, 1949, plaintiff billed defendant for its services on the basis of "two days per diem" plus out-of-pocket expenses, and defendant paid the bill.

On May 6 and June 27, 1949, defendant, exclusively by its own efforts, obtained from Stansbury, Inc., the said assignments of its rights under the leases on the Johnston land. Defendant did not employ plaintiff to render any services of any nature in connection with said assignments of the leases.

Defendant did not negotiate and obtain said assignments for the purpose of depriving plaintiff of a broker's fee. Defendant acted in good faith in obtaining said assignments and fully performed everything required to be performed by it under its agreement with plaintiff. Plaintiff did not render any services to defendant which entitled plaintiff to any overriding royalty.

Plaintiff was not at any time after April 9, ''1951 [1949]'' prevented from attempting to negotiate, on its own behalf or on behalf of any of its clients, any assignment of any leasehold interest held in any of said property by Stansbury, Inc.

Defendant has drilled several wells upon said property and produced large quantities of oil, the exact amount of which is unknown to plaintiff. The value of an overriding royalty interest of ½ of 1 per cent of the production under said assignments is unique and not susceptible of exact computation.

It is not true that there was any understanding of the parties that plaintiff had the exclusive right to negotiate and obtain said leasehold interest for defendant.

The information received by plaintiff from Johnston on April 9, 1949, and reported on said date by plaintiff to defendant, was not on said April 9 a matter of public knowledge. Said information was not given to plaintiff by Johnston in confidence and said information was not intended by plaintiff to enable, and did not in fact enable, defendant to obtain said assignments.

The agreement of April 8, 1949, was one employing an agent or broker to purchase real estate for compensation or a commission; said agreement was not in writing and there is no note or memorandum thereof subscribed by defendant or its agent.

The agreement of April 8, 1949, was one for the sale of an interest in real property by defendant to plaintiff; said agreement was not in writing and there is no note or memorandum thereof subscribed by defendant or its agent.

The agreement of April 8, 1949, was for the sale of an interest in real property and it was made by an agent of defendant; there is no writing subscribed by defendant stating the authority of such agent to make the agreement for defendant; and by reason of the foregoing the alleged agreement is invalid.

In view of the findings, the necessity for trial of the issues at law, alleged in the fifth and seventh causes of action, is obviated.

Appellant contends that the court erred (1) in determining in effect that the contract of employment (of plaintiff by defendant) was special and not general, and that the employment terminated on April 9, 1949, when plaintiff did not obtain a lease from the Johnstons upon the terms indicated by defendant; (2) in finding that defendant acted in good

faith in obtaining the assignments from Stansbury, Inc.; (3) in finding in effect that defendant was free to accept the benefit of plaintiff's work and to deal directly with Stansbury, Inc., for the "same object"; (4) in denying plaintiff's request for a jury trial; (5) in determining that the contract of employment was within the statute of frauds; (6) in determining that writings in evidence, including the signed depositions of Bell and Cross, were not sufficient memoranda to satisfy the requirements of the statute of frauds; (7) in determining that defendant was not estopped to plead the statute of frauds.

As to the first contention, namely, that the court erred in finding in effect that the contract of employment was a special contract, appellant argues that defendant did not indicate to plaintiff that its offer of $25 an acre for a three-year lease was its maximum offer, or the only basis on which it would deal, or that plaintiff's authority would cease if it could not conclude a lease on that basis; that Bell told Cross that defendant would want to reconsider the matter of rental if "it was any more"; that the price of $25 an acre was merely a "guide to negotiation" rather than a special limit imposed by defendant. The evidence shows that on March 18, 1949, Cross, acting for himself or an undisclosed principal (not defendant), employed plaintiff to locate land in Cuyama Valley which was available for leasing, and told Stipek to see if he could get a three-year lease on the Johnston property for $10 an acre. At that time Cross gave Stipek a memorandum which in substance directed Stipek to lease the Johnston land for three years for $10 an acre and one-eighth royalty; on March 24 (after Stipek had talked to the Johnstons), Stipek told Cross that Johnstons had an offer of $25 an acre from a Bakersfield concern and the offer was open for acceptance until the end of March. The evidence shows further that on April 8, Cross, acting as agent for defendant, told representatives of plaintiff that defendant would like to get a lease on the Johnston property for $25 an acre and one-eighth royalty, and he asked Stipek as to the basis upon which plaintiff would perform the work. Stipek replied that plaintiff would do the work for $25 a day, and out-of-pocket expenses, and ½ of 1 per cent royalty. Cross told Stipek that the arrangement was agreeable with Bell. The court found that under the oral agreement of April 8, 1949, between plaintiff and defendant the plaintiff was to obtain from the owners of the Johnston property an oil and gas lease of all the property;

that the lease should contain certain specified terms including a provision for rental at $25 an acre a year and a landowner's royalty of 12½ per cent. That finding was supported by the evidence.

The evidence also shows that Stipek called upon the Johnstons on April 9 and ascertained that the land had been leased to Stansbury, Inc.; and on that day Stipek told Cross that the land had been so leased. There was a conflict in the evidence as to what was said by Cross after Stipek reported that the land had been leased—Stipek testified that Cross told him to await further instructions; Cross testified that he told Stipek that Cross or Bell would contact Stipek if defendant wanted anything further. The court found that defendant did not give plaintiff any order that it should await further instructions or that plaintiff should do anything further for defendant. Also, the court found that the employment of plaintiff under said oral agreement was terminated on April 9, 1949. Those findings were supported by the evidence. It cannot be said that the provision in the oral agreement specifying $25 an acre for a lease from the Johnstons was a mere guide for negotiation and was not a special limitation imposed by defendant.

■ Appellant contends further, as above stated, that the court erred in finding, in effect, that defendant was free to accept the benefit of plaintiff's work and deal directly with Stansbury, Inc. It argues that the evidence shows that plaintiff imparted to defendant, in confidence, information regarding the availability of the Johnston land which information resulted in the eventual assigning of the Stansbury leases to defendant; that the information, at the time it was reported to defendant, was not a matter of public knowledge; that defendant received benefits from the employment of plaintiff and it cannot deprive plaintiff of its contingent fee by dealing directly with Stansbury, Inc. The court found (1) that plaintiff did not perform any of the things to be performed by it under the oral agreement, except that it did attempt to negotiate for a lease and did not obtain it, and except that it did report to defendant that Johnston had leased the land to Stansbury, Inc., for certain rental and royalty; (2) that defendant obtained the assignments by its own efforts; (3) that the information given by Johnston to plaintiff was not given in confidence. The evidence shows that the oral statement of Bert Stansbury, made on April 11, to the effect that he was willing to assign a part of the lease for $50 an acre

was not approved by the two other Stansbury brothers or other persons who had interests in the lease; that the assignments were not obtained until May 6 and June 27, and the assignments were not obtained for $25 an acre (the amount to be paid Johnston under the agreement of April 8) or $50 (the amount stated by Bert Stansbury) but were obtained by paying about $450 an acre or a total of approximately $221,000 and by permitting Stansbury, Inc., to reserve a royalty of 12½ per cent as to one assignment and a royalty of 17½ per cent as to the other. It thus appears that the assignments were ultimately obtained for a price that was vastly different from the price stated in the oral agreement with plaintiff, and that the assignments also pertained to another kind of interest and to other owners. About the middle of April, or a few days after the unsuccessful negotiation with Bert Stansbury, many persons in the oil business knew that Johnstons had leased to Stansbury, Inc. Various persons who had interests in Stansbury, Inc., were trying to sell the lease, and several of the major oil companies made offers to buy it. The trial judge stated in his memorandum of opinion that the preponderance of the evidence was clearly against the contention that plaintiff was the procuring cause of the assignments to defendant; that plaintiff may have been in a favorable position to deal with Johnston but the ultimate contract was not with him; that Stansbury, Inc., was willing to deal with anyone who would pay the biggest price, and that such willingness was known to the world of oil; and that the real procuring cause was the defendant's willingness to meet competitive prices. It cannot be said that there was any substantial benefit to defendant from the oral contract of employment of plaintiff, and it cannot be said that defendant was unjustly enriched by the information furnished by plaintiff that the Johnston land had been leased to Stansbury, Inc.

Appellant also contends, as above stated, that the court erred in denying appellant's request for a jury trial. It argues that issues of law presented by the complaint should have been tried first by a jury; that some of the issues of law, so referred to, were: What were the terms of the agreement. Did plaintiff perform the agreement? Did defendant breach its agreement?

In the first cause of action there were allegations regarding the making of the alleged oral agreement, the discovery that the Johnston land had been leased to Stansbury, Inc., and the report thereof to defendant; that defendant told plaintiff

to stand by and await instructions; that defendant refused to convey the royalty interest to plaintiff; that said interest is unique and not susceptible of exact computation and damages; that defendant holds such interest in trust and should be required to specifically convey the interest to plaintiff. The second cause of action included the allegations of the first cause of action and alleged further that plaintiff had an exclusive right to negotiate for the lease. The third cause of action included the allegations of the preceding causes of action and alleged further that defendant "confirmed said agreement, in writing signed by defendant," except that defendant denied that the scope of plaintiff's agency extended to obtaining a leasehold interest from Stansbury, Inc. The fourth cause of action included the allegations of the preceding causes of action and alleged further that defendant, in ordering plaintiff to stand by, precluded plaintiff from acting for other clients, and the information that Stansbury, Inc., was a party to the escrow enabled defendant to beat competitors, and hence defendant was estopped to deny plaintiff's claim and therefore holds the royalty interest in trust for plaintiff. The fifth cause of action alleged that plaintiff was damaged in the amount of $200,000 as the proximate result of defendant's refusal to convey the royalty interest to plaintiff.

On the second day of the trial, plaintiff amended its complaint by adding a sixth and a seventh cause of action. The sixth cause of action alleged that about March and April, 1949, at the request of defendant, plaintiff investigated the possibility of acquiring oil leases in the South Cuyama Field; the said services to be in consideration, in part, of a conveyance to plaintiff of a ½ of 1 per cent royalty under such lease as might be required by defendant; and that plaintiff be compelled to perform said agreement by conveying to plaintiff said royalty interest. The seventh cause of action alleged that plaintiff has been damaged in the amount of $200,000 as a proximate result of defendant's refusal to convey the royalty interest to plaintiff.

The defendant alleged as a second affirmative defense that the agreement mentioned in the complaint purports to employ plaintiff, a broker, to purchase real estate for a commission; that said agreement was not in any writing subscribed by defendant or its agent, and there was no memorandum thereof subscribed by the defendant or its agent. When the case was called for trial, defendant filed its third and fourth affirmative

defenses. In such third defense it was alleged that the agreement mentioned in the complaint is one for the sale of an interest in real property, and that said agreement is invalid since it was not in any writing subscribed by defendant or its agent. In such fourth defense it was alleged that the agreement mentioned in the complaint was for the sale of interest in real property, and that the agreement was made by the agent of defendant; that the authority of the agent was not in writing subscribed by defendant, and that said agreement is invalid.

When the case was called for trial, the defendant objected to a trial by jury upon the ground that the issues were exclusively within the equity jurisdiction of the court, and defendant made a motion that the case be tried without jury. Plaintiff argued that the issue in the case was primarily the legal issue. ■ The court ruled that the first four causes of action would be tried without a jury, and the fifth cause of action, if the case proceeded that far, would be tried by a jury. (It is to be noted that when said ruling was made there were only five causes of action—the sixth and seventh causes of action were added during the second day of the trial.) In summary, the first four causes of action presented equitable issues—to declare a trust and for specific performance; the fifth cause of action was for damages; the sixth was for specific performance; and the seventh was for damages. In *Peterson* v. *Peterson,* 74 Cal.App.2d 312, it was said at page 321 [168 P.2d 474] : ''In *Connell* v. *Bowes* (1942), 19 Cal.2d 870, 871 [122 P.2d 456], the court points out that 'It is now established in this state . . . that if a complaint states two complete rights of action, one legal and one equitable, a jury trial may be obtained upon the issues raised by the legal cause.' In such circumstances, however, 'the equitable issues are tried first, and then, if any legal issues remain, a jury may be called.' [Citation.] The practical reason for this procedural rule is that the trial of the equitable issues may obviate the necessity of a trial of legal issues [Citation].'' The trial court did not err in its ruling regarding a jury trial. In determining the equitable issues the court determined issues which obviated a trial by jury of the legal issues.

Appellant also contends that the court erred in determining that the oral agreement of employment was within the statute of frauds. The allegations in the three affirmative defenses were to the effect that the oral agreement was invalid under

the statute of frauds. Section 1624 of the Civil Code (statute of frauds) provides in part: "The following contracts are invalid, unless the same, or some note or memorandum thereof, is in writing and subscribed by the party to be charged or by his agent: . . . 4. An agreement for the leasing for a longer period than one year, or for the sale of real property, or of an interest therein; and such agreement, if made by an agent of the party sought to be charged, is invalid, unless the authority of the agent is in writing, subscribed by the party sought to be charged; 5. An agreement authorizing or employing an agent or broker to purchase or sell real estate for compensation or a commission; 6. . . ." █ A question arises as to whether, under said subdivision 5, the oil lease referred to in the agreement was real property. In *Dabney* v. *Edwards*, 5 Cal.2d 1 [53 P.2d 962, 103 A.L.R. 822], it was held (p. 11) that an oil lease which provides in addition to a definite fixed term an indefinite term—that the lease is to continue "so long thereafter as oil or gas or either of said substances is produced therefrom in quantities sufficient to pay to pump"—is included in the term "real estate" and must be deemed to be real property within the meaning of said section 1624. In the present case the express words regarding the term of the lease, used in the oral agreement and in the memorandum made by Cross, were "three-year lease." Stipek testified that if a client tells him that he (client) wants an oil lease for "$25 an acre, one-eighth overriding royalty, three-year lease," he (Stipek) would believe that the client means that he also wants "a so-long-thereafter clause" included in the lease. The proposed lease, which Stipek took with him when he went to see the Johnstons, had such "so long thereafter" provision in it. The court found that the period within which drilling operations must be commenced was three years, and the term of the lease was to be so long after said three-year period as oil or gas or other hydrocarbon substances are produced from the property. That finding is supported by the evidence. The oil lease was real property within the meaning of the statute of frauds. The court also found that the allegations in the three affirmative defenses (regarding invalidity under the statute of frauds) were true. Those findings to the effect that the oral agreement was invalid under the provisions of the statute of frauds are supported by the evidence.

█ Appellant contends further that the signed deposition of Mr. Bell, president of defendant corporation, was a

sufficient memorandum to satisfy the requirements of the statute of frauds. In his deposition, Mr. Bell admitted the oral agreement. The deposition was taken by plaintiff under the provisions of section 2055 of the Code of Civil Procedure. Section 2006 of that code provides that a deposition "must" be subscribed by the witness. It thus appears that it was mandatory that Mr. Bell sign the deposition. Appellant cites *Kellogg* v. *Peddicord*, 181 Ill. 22 [54 N.E. 623], wherein it was held that a deposition was a sufficient writing to satisfy the statute of frauds. It is to be noted, however, that the deposition in that case was voluntarily made and signed by the defendant and produced in evidence by him in his own behalf. Appellant also cites *Garnsey* v. *Gothard*, 90 Cal. 603 [27 P. 516], wherein it was held (pp. 607-608) that a declaration in a verified answer that real property was conveyed to defendant in trust was sufficient to satisfy the requirements of section 852 of the Civil Code (which provided that no trust in relation to real property is valid unless declared by written instrument subscribed by the trustee). It is to be noted that in that case the answer did not allege that the purported trust was invalid under the provision of said section 852. Respondent (defendant) herein cites *Jamison* v. *Hyde*, 141 Cal. 109 [74 P. 695], wherein the answer admitted the oral contract and also alleged the statute of frauds as a defense. It was held therein (p. 112) that the signed answer was not a waiver of the right to rely upon the statute of frauds. It was also stated therein (p. 112) that: " '[I]f a defendant sought to be charged upon a contract within the statute of frauds, admits the contract in his answer, and does not claim the benefit of the statute, he is considered as waiving its protection and as furnishing by his answer the very proof which the statute requires. But if the admission is coupled with a claim to the protection of the statute, the rights of the party stand as though the admission had not been made [Citation].' '' In the present case, the answer alleges three affirmative defenses based upon the statute of frauds. Furthermore in the present case, the deposition was not voluntarily made, nor was it presented in evidence by the defendant; on the contrary, as above stated, it was mandatory that Mr. Bell give and sign his deposition. The deposition herein was not a sufficient memorandum to satisfy the requirements of the statute of frauds.

If a detailed discussion were made regarding the other writings referred to by plaintiff as being sufficient to satisfy

the statute, this opinion would be prolonged unnecessarily. Those writings were not sufficient memoranda to satisfy the requirements of the statute of frauds.

The findings to which we have referred are sufficient to show that defendant was not estopped to rely upon the statute of frauds.

By reason of the above conclusions, it is not necessary to discuss other contentions on appeal.

The judgment is affirmed.

Shinn, P. J., concurred.

A petition for a rehearing was denied July 15, 1954, and appellant's petition for a hearing by the Supreme Court was denied August 26, 1954.