[Civ. No. 27983.    Second Dist., Div. One.    July 25, 1966.]

HARRY JAFFE, Plaintiff and Appellant, v. THE ALBERT-SON COMPANY et al., Defendants and Respondents.

---

*Assigned by the Chairman of the Judicial Council.

594

O'Melveny & Myers, Philip F. Westbrook, Jr., Louis T. La Tourrette, Greenberg, Shafton & Bernhard and Herbert A. Bernhard for Plaintiff and Appellant.

Latham & Watkins, Richard W. Lund, Ball, Hunt & Hart, Joseph A. Ball, Joseph D. Mullender, Jr., Gibson, Dunn & Stern, John P. McGinley and Henry W. Low for Defendants and Respondents.

KINCAID, J. pro tem.*—Harry Jaffe, the plaintiff herein, appeals from a judgment following a jury trial and resulting from a directed verdict as to the first cause of action of his third amended complaint and a nonsuit as to his second and third causes of action.

The Jaffe case, together with two related actions, hereinafter referred to as the Gottlieb action and the American-Hawaiian action, were assigned to one judge for all purposes, including discovery, pretrial and trial. As a part of the pretrial conference order, on motion of Gottlieb and Jaffe and over the opposition of the defendants, it was ordered that the three cases be and they were consolidated for trial. It was further determined that the court would try all equitable issues first and that if any legal issues remained they would be tried by the jury. Certain of the causes of action were determined to be equitable in nature, and others, including Jaffe's causes of action, were in law.

The evidence discloses that The Albertson Company (Albertson herein) is a corporation and owned approximately 11,500 acres of real property situated partially in Ventura County and in Los Angeles County. Albertson employed a licensed real estate broker, L. O. Kittle, to sell the property. Gottlieb became interested in the possibility of purchasing this property and employed appellant Jaffe, a licensed real estate broker, to represent him.

In October 1961, Jaffe contacted Kittle to explore the possibility of purchasing the property. Jaffe and Kittle toured the ranch property and Kittle mentioned an asking price of $34,500,000. He indicated that if Jaffe could develop a proposal that could be consummated, Albertson would not only pay Kittle's commission but would cooperate with the broker who made the deal to the extent of a two and one-half percent commission. After a preliminary investigation by Jaffe of the title, easements and liens on the property, Jaffe introduced Gottlieb to Kittle. Gottlieb and Albertson reached an oral understanding on a price of $30,000,000 cash if they could agree on the terms of the sale.

About November 10, 1961, Jaffe submitted a written offer to purchase in behalf of Gottlieb for $30,000,000 in cash, with $1,500,000 to be deposited in escrow. Carroll Austin, vice-president of Albertson, stated that Albertson would require an additional $1,500,000 to be paid outside of escrow. Two of the

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.

several conditions of the proposed sale imposed by Albertson were that the purchase be made on an "as is" basis after a personal inspection of the ranch and that the escrow must close during the year 1961. Albertson was willing to pay the cost of a regular title search report but Gottlieb insisted upon obtaining an additional extended coverage title insurance policy. The extended coverage policy necessitated a survey of the property, the cost of which would be about $50,000. Albertson declined to assume the cost of these items. Investigation was had which resulted in discussions that a survey might possibly be completed and the extended coverage policy of title insurance written to permit the close of the transaction by the end of the year. Jaffe said Gottlieb was willing to proceed with the survey work and assume its cost, together with that preliminarily necessitated by the investigation relating to the extended coverage policy provided Albertson would sign a written contract of sale. Albertson refused to do so.

Jaffe testified that he later telephoned Kittle stating that Gottlieb was prepared to proceed with ordering the survey and title work on the strength of their preliminary oral understanding of the terms of the purchase and sale, including the payment of two and one-half percent real estate brokers commission by Albertson to Jaffe at close of escrow. He testified Austin then said, "It's a deal," and that Austin further stated he would authorize their attorneys to prepare a contract incorporating the matters verbally agreed upon. While Austin agrees that he said we have a "deal," the deal was that he was going to call in defendant's attorneys and have them immediately draw up a proposed draft to incorporate the necessary items and conditions of a sale.

Terms of the written offer of purchase by Jaffe of November 10, 1961, had included that an escrow be opened, that $1,500,000 be deposited therein to be applied to the purchase price, a full coverage policy of title insurance was to be furnished, and upon closing of the escrow and of the sale a commission of two and one-half percent of the sale price was to be paid to Jaffe. No such written contract was ever finally prepared or executed by any party to the transaction. No escrow was ever opened or escrow instructions prepared or signed. Each party employed attorneys and each submitted suggested drafts of a contract of purchase and sale. Gottlieb reserved the right to back out of the deal if his survey showed that there were less than 11,000 acres or the preliminary report for extended coverage of title insurance disclosed title

defects or objectionable easements. Gottlieb was to pay for the survey in any event. But later drafts by his attorneys of the proposed contract changed this latter condition so that if Gottlieb rescinded for one or more of the reasons entitling him to do so he would recoup the costs of the survey by tendering the results thereof to Albertson. This amendment was rejected by Albertson.

The several disagreements as to the terms and conditions to be incorporated in the contract continued and the negotiations began to deteriorate by the end of November 1961. On December 4, 1961, one of Albertson's attorneys notified Gottlieb and his attorneys that while Albertson would continue negotiating with Gottlieb, from that point on Albertson would also entertain other proposals for the sale of the property. On December 10, 1961, all negotiations with Gottlieb were terminated by Albertson upon notification that it had sold the property to someone else. Between December 4 and December 10, American Hawaiian Steamship Company, a corporation, had offered to buy the property for $32,000,000 cash.

Shortly thereafter the suit by Gottlieb was filed. His complaint was against Albertson as to four causes of action and as to the fifth, additional defendants were named consisting of Kittle, American-Hawaiian, Paul W. Trousdale, Trousdale Construction Company and S. Francis Zeiler charging them with conspiracy to tortiously interfere with his alleged rights. The Trousdale defendants had assisted American-Hawaiian in making its purchase offer and Zeiler was American-Hawaiian's real estate broker.

Jaffe then promptly filed the within action. His third amended complaint alleges breach of contract by Albertson on two theories: (1) that he was a third party beneficiary of the alleged Gottlieb-Albertson oral contract because one of the asserted terms thereof was that he would be paid a commission, and (2) that Albertson had made a direct oral promise to him to pay a commission. Jaffe also charged Albertson, Kittle, American-Hawaiian, the Trousdales, Zeiler and Cal-Wide, Inc. with conspiracy to tortiously interfere with his alleged rights. Cal-Wide, Inc. was another Trousdale corporation.

By this time Albertson had ceased dealing with American-Hawaiian because of the litigation, and so the latter sued Albertson for specific performance, and Gottlieb for a declaration of rights. There were also various cross-complaints and a counterclaim. In the Gottlieb case Albertson counterclaimed

against Gottlieb to quiet title and cross-complained against Gottlieb for slander of title. Zeiler also cross-complained in the Gottlieb case. He sued Albertson for breach of contract to pay him a commission on the American-Hawaiian sale, and he sued Albertson, American-Hawaiian, the Trousdales, Cal-Wide, Albert Dietsch and Samuel Moerman for conspiracy to tortiously interfere with his rights. Dietsch was an officer of Trousdale Construction Company, and Moerman was an officer of American-Hawaiian. In the American-Hawaiian case Gottlieb also cross-complained against Albertson, Kittle, American-Hawaiian, the Trousdales and Zeiler for tortious interference. This cross-complaint was identical to Gottlieb's fifth cause of action in the Gottlieb case. All of these cases were ordered consolidated for trial.

Prior to the trial Albertson and American-Hawaiian entered into a formal written contract for a sale of the property, and the latter agreed to pay Zeiler's commission. American-Hawaiian therefore dismissed its first cause of action for specific performance against Albertson, and Zeiler dismissed his cross-complaint. The remaining portions of the American-Hawaiian case, being the action against Gottlieb for a declaration of rights and the Gottlieb cross-complaint, which was identical to the fifth cause of action in the Gottlieb case, were also, in effect, eliminated temporarily in that the trial court ruled that these causes of action would trail. All parties agreed that the determination of the Gottlieb and Jaffe cases would dispose of the American-Hawaiian case.

The jury trial commenced as to the Gottlieb and Jaffe cases only, less the Zeiler cross-complaint. At the close of the plaintiff's case the court granted nonsuits on the causes of action for tortious interference and on Jaffe's second cause of action based on the claimed direct promise of Albertson to pay him a commission. This eliminated Gottlieb's fifth cause of action and Jaffe's second and third causes of action. The trial then continued on Gottlieb's first, second, third and fourth causes of action based on contract, and on Jaffe's first cause of action based on the theory that he was a third party beneficiary of Gottlieb's alleged oral contract. There also remained Albertson's counterclaim to quiet title and cross-complaint for slander of title. When the evidence was closed, the court ruled on Gottlieb's equitable causes of action. These were his first and second causes of action for a declaration that he was entitled to specific performance and for specific performance. The court found that there was no contract, and that if there

was a contract Albertson was not estopped to assert the statute of frauds. The court also ruled in favor of Albertson on its counterclaim to quiet title. As to the remaining causes of action of Gottlieb and Jaffe, the court directed verdicts in favor of Albertson. The only surviving cause of action was Albertson's cross-complaint for slander of title. This was submitted to the jury, and a verdict returned in favor of Gottlieb. The remaining portion of the American-Hawaiian case was disposed of when the court declined to make a declaration of rights as to Gottlieb and Gottlieb dismissed his cross-complaint. Since the cases had been consolidated, one judgment was entered.

Gottlieb appealed from the adverse judgment entered against him on each of his five causes of action and Albertson appealed from the judgment against it on its cross-complaint. These parties later reached a settlement and dismissed their appeals. From this welter of litigation only the instant Jaffe appeal survives.

Jaffe appeals from the judgment, claiming that it was error to direct a verdict on his first cause of action and to grant nonsuits on his second and third causes of action. He also complains of error prior to trial in denying him the right to take depositions with respect to the written contract made between Albertson and American-Hawaiian for the sale of the property after the litigation had commenced, in denying him the right to subpoena the contract during trial, and in limiting the evidence to events occurring up to December 10, 1961, when Albertson refused to deal further with Gottlieb.

Jaffe contends that the trial court erred in directing a verdict as to his first cause of action because there was substantial evidence to support a verdict thereon in his favor. The evidence upon which he chiefly relies as being substantial proof that he was a third party beneficiary of an oral contract of purchase and sale is his version of his telephone conversation with Austin wherein the latter said, ''It's a deal'' and that he would authorize Albertson's attorneys to prepare a contract incorporating the matters verbally agreed upon. He concedes, in order to support his position that a binding oral contract was thus created, it must appear from the evidence that the essential terms of the contract were sufficiently definite. To the contrary, the testimony of both Jaffe and Gottlieb demonstrate that several essential terms of the proposed contract remained indefinite and undetermined.

One of the oral understandings that was to be included in

any written contract was that Gottlieb was going to have the right to back out of the deal if his survey showed that there were less than 11,000 acres or if the preliminary report for extended coverage title insurance disclosed title defects or objectionable easements. In any event, Gottlieb was to pay for the survey. When Gottlieb's attorneys started redrafting the proposed contract, they reversed this so that if Gottlieb rescinded for one or more of the reasons entitling him to do so, he could recoup the cost of the survey by tendering the results thereof to Albertson.

There were numerous other items of disagreement which arose in the course of preparing written drafts of a contract. Albertson insisted that the signing of any contract and the approval by Gottlieb of the easements on the property be simultaneous. At the meeting on November 10, 1961, the Albertson representatives stated there would be no contract until Gottlieb approved the easements. There was nothing said on November 14, 1961, which would modify this understanding. Since Gottlieb had not approved the easements, and other essential terms had not been resolved, no contract was made at that time as claimed by Jaffe.

In his oral proposal of purchase Gottlieb reserved a right to rescind the transaction upon the additional ground of possible objection to matters not of record which might adversely affect the property as shown by the preliminary report of extended title coverage. Albertson was given the right to prevent rescission by correcting such defects, but was not obligated to do so.

In the November 21 draft of a proposed written contract Albertson's attorneys included this condition providing therein that, should the seller be unwilling or unable to cure such defect or defects within a specified time the buyer at his option may accept title as set forth in the preliminary title report for the extended coverage owner's policy or may rescind. In the latter event the buyer was to have a return of the money deposited by him in the escrow.

Gottlieb's attorneys, on November 28, submitted a redraft of the proposed contract striking the word "unwilling" as related to the curing or correcting of such defects thus, in effect, converting Albertson's option into an obligation to endeavor to clear title. By the original proposal, if Gottlieb was not satisfied with the condition of the title as shown by the preliminary title report he could withdraw from the purchase. If Albertson was not satisfied with Gottlieb's objec-

tions it could attempt to meet such objections or permit Gottlieb to terminate the transaction. This did not give Albertson the right to rescind and was consistent with his insistence that the purchase of the property be made on an ''as is'' basis and for an early termination of the escrow. Albertson refused to accept this amendment.

Gottlieb had assured Albertson that he could put up the balance of the purchase price of the property when the escrow was ready to close. Albertson's proposed draft of November 21 provided for deposit of the balance by Gottlieb within five days after notice that the escrow was otherwise ready to close. The Gottlieb draft proposed a much later date. At a meeting held on November 30 Gottlieb proposed a date 60 days from the time the escrow was ready to close. This had the effect of extending the escrow another 55 days. When this was refused he demanded 30 days. Then he proposed that a definite date be fixed in the future for the deposit of the remaining money and that if the closing of the escrow was delayed beyond that date Albertson would have to pay him interest on the money so deposited. These amendments to Gottlieb's earlier offer were refused by Albertson.

Viewing the evidence in its most favorable light in behalf of appellant it seems clear that at all times in question Gottlieb knew he had no sufficiently definite contract but was still trying to negotiate one. This is the claimed oral contract upon which Jaffe's first cause of action as a third party beneficiary depends for validity. The court properly found that there was no contract between Gottlieb and Albertson, and that Albertson was not estopped to assert the statute of frauds.

Jaffe argues that the evidence herein is sufficiently substantial to create an estoppel on the part of Albertson to invoke the statute of frauds as to Jaffe's first cause of action. He relies in part on his written memorandum of November 8, 1961, in which he and his associates state they are desirous of purchasing the Albertson ranch on certain conditions. The final condition was that, upon closing of the escrow, the recordation of all documents and the closing of the sale, a commission of two and one-half percent of the sale price is to be paid Jaffe. This memorandum was never signed by Albertson.

As heretofore indicated the evidence fully supports the finding of the court that all negotiations were oral, that no writing with respect thereto was ever signed by the parties, that the parties did not intend to make a contract until such time as they might execute a formal written contract for the

purchase and sale of the property and that, while Jaffe participated in the negotiations, he at no time had authority to act for or to bind Gottlieb to a contract or to any term thereof.

Jaffe, being unable to obtain any writing authorizing him to act in behalf of Albertson as a real estate broker or to pay him a commission as such, elected to proceed with Gottlieb under the oral negotiations in the hope of eventually becoming a part of the formal agreement of purchase and sale. The court properly found that there was no substantial evidence of any oral or written contract between Gottlieb and Albertson in which Albertson promised to pay Jaffe a real estate brokers commission.

So far as here applicable, the statute of frauds provides (Civ. Code, § 1624): ''The following contracts are invalid, unless the same, or some note or memorandum thereof, is in writing and subscribed by the party to be charged or his agent: . . . 4. An agreement . . . for the sale of real property . . . and such agreement, if made by an agent of the party sought to be charged, is invalid, unless the authority of the agent is in writing, subscribed by the party sought to be charged; 5. An agreement authorizing or employing an agent or broker to purchase or sell real estate. . . for compensation or a commission.'' To the same effect see subdivisions 4 and 5 of section 1973 of the Code of Civil Procedure.

Our courts have consistently applied the foregoing code provisions in refusing to allow a real estate broker to recover his commission where a signed written memorandum or contract, clearly complying with the statute, did not exist. As pointed out in *Franklin* v. *Hansen,* 59 Cal.2d 570, 575 [30 Cal.Rptr. 530, 381 P.2d 386], real estate brokers are licensed as such only after they have demonstrated a knowledge of laws relating to real estate transactions and they thus require less protection against pitfalls encountered in transactions regulated by those laws. The court thereupon quoted the language (p. 575) of *Pacific etc. Dev. Corp.* v. *Western Pac. R.R. Co.,* 47 Cal.2d 62, at page 70 [301 P.2d 825] as follows: ''. . . 'Plaintiff is a licensed real estate broker and, as such, is presumed to know that contracted for real estate commissions are invalid and unenforceable unless put in writing and subscribed by the person to be charged. [Citations.] Nevertheless, plaintiff failed to secure proper written authorization to protect itself in the transaction. Rather it assumed the risk of relying upon claimed oral

promises of defendant, and it has no cause for complaint if its efforts go unrewarded.' "

Jaffe argues, however, that even though the statute of frauds might otherwise bar his claim for recovery of his commission, the conduct of Albertson was such as to estop it from invoking such statute. He principally relies upon the rule set forth in *Monarco* v. *Lo Greco*, 35 Cal.2d 621, 623-624 [220 P.2d 737], to the effect that, in order "to prevent fraud," a party to an oral contract will be estopped to invoke the statute of frauds against its enforcement where: (1) such party has induced the other party to "seriously" change his position in reliance on the contract so that he would suffer "unconscionable injury" were the contract not enforceable by him; or (2) where such party has accepted the benefits of the oral contract and would be "unjustly enriched" if it were not enforced against him.

There is no evidence of unjust enrichment. Albertson did not conclude a sale to Gottlieb and did not conclude any sale as a result of the efforts or services of Jaffe.

The other basis for the claimed estoppel is a serious change of position on his part in reliance upon inducements by Albertson as promisor which results in unconscionable injury if the oral promise is not enforced. These inducements include the professed intent of Albertson to stand by its oral contract to go through with the deal even if someone offered it more money for the property. He claims that, in reliance upon the alleged oral contract of November 14, he continued to expend substantial time and effort to December 10 in connection with the property on the assumption that Gottlieb would acquire the title.

As heretofore found there was no oral contract to enforce. Furthermore, as a professional real estate broker, Jaffe must have been fully aware that he was proceeding in his efforts at his own peril in that, if a contract was not made, the statute of frauds would undoubtedly be asserted as a defense to any later claim on his part. His continued efforts must be construed as having been made with full knowledge of the weakness of his position and in the hope that a written contract might eventuate under which he might participate.

The ultimate buyer of the Albertson property, American-Hawaiian, never knew or was contacted by Jaffe. In *Pacific etc. Dev. Corp.* v. *Western Pac. R.R. Co., supra,* 47 Cal.2d 62, 70, an even stronger factual situation in favor of the claim of a broker was presented. There the plaintiff broker had origi-

nally found and negotiated with an ultimate purchaser of certain real property. No writing satisfying the statutory requirement ''subscribed by the party to be charged, or his agent'' was ever made. On page 70, the court said: ''Nor is there any merit to plaintiff's contention that defendant is estopped to plead the statute of frauds by reason of the fact that Stratton, on behalf of defendant, finally concluded an option agreement with Lenfest for purchase of the property and the sale was subsequently consummated. This is not a case of unconscionable injury to plaintiff because of a change of position in reliance upon the alleged contract of employment (*Le Blond* v. *Wolfe,* 83 Cal.App.2d 282 [188 P.2d 278]) or an unjust enrichment of defendant through acceptance of the benefits of the alleged contract without itself being obligated thereunder. (*Monarco* v. *Lo Greco,* 35 Cal.2d 621 [220 P.2d 737].) The fact that plaintiff rendered services and conducted unsuccessful negotiations with Lenfest does not constitute a change of position to plaintiff's detriment, nor does the fact that defendant refused to pay plaintiff a real estate commission upon an option which defendant later procured through direct negotiations with Lenfest constitute an unjust enrichment within the meaning of the estoppel doctrine. To hold otherwise, in the absence of any showing of fraud, would defeat the purpose of the statute of frauds in relation to real estate transactions. . . .'' The trial court herein properly found that there was not substantial evidence to create an estoppel on the part of Albertson to invoke the statute of frauds as to Jaffe's first cause of action.

▪▪▪ Appellant Jaffee next argues that the court erred in directing a verdict in favor of defendant as to his first cause of action by applying erroneous concepts of law which deprived him of his constitutional right to a jury trial. We find this argument without merit.

As heretofore related, the instant Jaffe case, together with the Gottlieb and American-Hawaiian cases were assigned to one judge for all purposes including trial. On motion of Gottlieb and Jaffe and over opposition of American-Hawaiian, Albertson and all other defendants, the three cases were ordered consolidated for trial, the court to impanel a jury but to try all equitable issues first, any remaining legal issues to be submitted for determination by the jury.

At the conclusion of the jury trial the court ruled on Gottlieb's first and second causes of action which were concededly equitable in nature, as well as on Albertson's counterclaim to

quiet title. The court properly found that an oral agreement does not exist between Albertson and Gottlieb for the sale and purchase of the property, Albertson is not estopped from raising the defense of the statute of frauds and Gottlieb is not entitled to specific performance of any alleged contract or damages in any sum. The directed verdicts as to Gottlieb's third, fourth, and fifth and as to Jaffe's first causes of action followed.

Jaffe, seeking relief under the same alleged contract as did Gottlieb in his case could have originally joined as a party plaintiff in the latter. (Code Civ. Proc., §§ 378, 427.)

When the court granted their subsequent motion to consolidate their cases for trial they became united for all purposes and the court correctly made one set of findings and one judgment. The finding and judgment upon an issue operates in favor of and against all plaintiffs in the same manner as if they had originally joined as plaintiffs in bringing the action. (*Stanton* v. *Superior Court*, 202 Cal. 478, 484 [261 P. 2001]; *Wolfson* v. *Beatty*, 118 Cal.App.2d 392, 398 [257 P.2d 1017].)

That Gottlieb and Jaffe became united as parties plaintiff is further shown by their conduct both before and during the jury trial. Bernard Reich was at all times attorney of record for both. He associated O'Melveny and Myers, by Philip Westbrook, as counsel for Jaffe.

They coordinated their opening statements so that Reich covered some points and Westbrook others. They divided the work in handling witnesses. There were four important adverse witnesses: L. O. Kittle, Carroll Austin, Keene Watkins and Austin Peck. Westbrook took the primary responsibility for Kittle and Peck. Reich, on the other hand, did most of the examining of Austin and Watkins. Reich and Westbrook presented a large part of their evidence by deposition. Over 1,000 pages of the transcript consists of Reich reading the questions and Westbrook reading the answers. When it came time to argue the Gottlieb specific performance case (which Jaffe now claims has nothing to do with his case), Westbrook was given equal time, and he and Reich both argued at length.

It is difficult to conceive of a situation where Jaffe could have participated in the litigation to any greater extent. Jaffe jointly controlled the litigation. He was not just presenting his evidence along with Gottlieb in a consolidated case. He was actively participating in Gottlieb's case as well as his own.

Jaffe and Gottlieb were compelled to rely on substantially the same evidence to establish their respective causes of action. Each sought recovery under the same identical alleged contract. Each sought to enforce that contract against the same identical defendant, Albertson. Their interpretation of the evidence was the same. They both relied on the November 14 "It's a deal" conversation as the basis of the contract; they both tried to avoid the effect of the unresolved written contract negotiations. Jaffe was Gottlieb's agent, he was Gottlieb's third party beneficiary, and he had a financial interest in Gottlieb's litigation. In seeking specific performance of the contract, Gottlieb was asking, not only for performance of Albertson's promise to sell the property to him, but also of Albertson's promise to pay Jaffe. If Gottlieb had prevailed, the judgment would have had the effect of enforcing both promises.

The specific performance action was, in effect, essentially a case of Gottlieb and Jaffe v. Albertson. When Jaffe made his motion to consolidate his case with that of Gottlieb for trial and actively participated in and jointly controlled the prosecution of both cases he assumed both the benefits and burdens of this procedure. He sought with Gottlieb the benefit of a determination in the specific performance cause of action. Had the issues there presented been decided in favor of Gottlieb and Jaffe the essence of Jaffe's first cause of action would have been established. With these issues having been adversely decided, he is jointly bound by the adjudication in the Gottlieb suit. As said in the case of *Perkins* v. *Benguet Consol. Min. Co.*, 55 Cal.App.2d 720, 739 [132 P.2d 70], "Any other rule would lead to absurdities." (See also *Stafford* v. *Russell*, 117 Cal.App.2d 319, 320 [255 P.2d 872].)

Jaffe nevertheless contends that he was entitled to a jury trial on all the issues presented by his first cause of action even though the court had found that the oral contract between Albertson and Gottlieb, upon which his claim depends, did not exist and that Albertson is not estopped to raise the defense of the statute of frauds. The only basis for his legal claim for damages is that, under the same evidence, he became a third party beneficiary by virtue of the identical contract and that Albertson is likewise estopped as to him from invoking the statute of frauds. ▮ As said in *Ford* v. *Palisades Corp.*, 101 Cal.App.2d 491, 499 [225 P.2d 545]: "The question of estoppel to plead the statute of frauds made by the complaint is an equitable issue. [Citations.]

608

■ There is no right to a trial by jury where the gist of the action is for the enforcement of a right cognizable only in equity. [Citations.]'' (See also *Richard* v. *Degen & Brody, Inc.*, 181 Cal.App.2d 289, 295 [5 Cal.Rptr. 263]; *Moss* v. *Bluemm*, 229 Cal.App.2d 70, 72 [40 Cal.Rptr. 50]; *Keans etc. Inc.* v. *Alphonzo E. Bell Corp.*, 126 Cal.App.2d 311, 325 [272 P.2d 35].)

The case of *Hudson* v. *Morgan & Peacock Properties Co.*, 170 Cal.App.2d 328 [339 P.2d 180], relied upon by appellant on this point is distinguishable from the foregoing authorities in certain respects. It involved a suit between real estate brokers for damages for breach of an oral agreement to share commissions. The statute of frauds does not apply to a contract between brokers for the sharing of commissions (*Holland* v. *Morgan & Peacock Properties Co.*, 168 Cal.App.2d 206, 210 [335 P.2d 769]) so this issue was not involved. It was tried by jury. Conflicting evidence was introduced as to whether there had been misrepresentation that defendants were licensed. The court instructed the jury that as a matter of law defendants were estopped to deny that one of them was not licensed. Following a verdict for plaintiff the court granted a new trial on the basis it had erred in instructing the jury that there was estoppel as a matter of law. In affirming the order granting a new trial the court held that the existence of an estoppel turned upon resolution of conflicts in the evidence and that the court correctly granted a new trial to permit these fact questions to be left to the jury under proper instructions. The trial court had not, as in our instant case, made a finding under the conflicting evidence on the issue of estoppel. The instruction that there was estoppel as a matter of law was the same as saying that there was no conflict in the evidence on estoppel. This error was the basis for granting the new trial. ■ Insofar as the holding in *Hudson* v. *Morgan & Peacock Properties, Co., supra,* may be deemed to differ from those in *Ford* v. *Palisades Corp., Richard* v. *Degen & Brody, Inc.,* and *Moss* v. *Bluemm, supra,* the proper rule as applied to the evidence herein is that the question of estoppel to plead the statute of frauds is an equitable issue triable by the court without a jury.

It is established in this state that if a complaint states two complete rights of action, one legal and one equitable, a jury trial may be obtained upon the issues raised by the legal cause. (*Pacific Western Oil Co.* v. *Bern Oil Co.*, 13 Cal.2d 60, 66, 69 [37 P.2d 1045].)

However, when a case involves both legal and equitable issues the court may in its discretion decide the equitable issues first. If the decision as to the equitable issues is such as is determinative of the legal issues a jury trial as to the latter is obviated. If not, the jury trial as to the remaining issues will follow. (*Connell* v. *Bowes,* 19 Cal.2d 870, 872 [123 P.2d 456].) Illustrative of this rule is *Thomson* v. *Thomson* (7 Cal.2d 671, 682, 683 [62 P.2d 358, 117 A.L.R. 1]). In that case the plaintiff claimed to be the owner and in possession of certain real property and brought suit against defendant to quiet his title. Defendant answered alleging ownership in him of an undivided one-fourth interest of the property. By cross-complaint he sought to eject the plaintiff and recover possession. The court held that the issues arising out of plaintiff's cause of action were equitable and those resulting from defendant's answer and cross-complaint were legal. The court then said (pp. 682, 683) : ''. . . We, therefore, have for trial in the same action both equitable and legal issues. The procedure to be followed when such a condition exists has been indicated by Mr. Justice Henshaw in a concurring opinion in the case of *Angus* v. *Craven* [132 Cal. 691 (64 P. 1091)], *supra,* (p. 699), in the following apt language: 'Under our system, equitable and legal rights are determined in the same forum. It is within the discretion of the court to control the order of proof upon the issues joined. In the natural order, before defendant was entitled to a hearing upon the equitable [*sic* (legal)] issues tendered, she must defeat plaintiffs upon the equitable issues presented by them. This was the view of the trial court, and in pursuance of it, it took to itself, as was proper, the determination of these equitable matters. The result was, that it found defendant's deeds to have been forgeries. Had it reached the opposite conclusion, then defendant might with right have insisted that the remaining issues of law be tried before a jury. But that time never arrived, and I do not concede the right of a litigant to oust a court of equitable jurisdiction in an action of purely equitable cognizance, merely by tendering additional issues which are triable at law before a jury. It is sufficient if a jury be had when those issues come to trial.'

''This procedure, as indicated above, was followed substantially by the trial court in the present action. It first passed upon the equitable issues presented by plaintiff's complaint to quiet title and defendant's answer thereto. Having determined these issues in favor of the plaintiff—that is, having

found that the plaintiff was the owner of said real property and that defendant had no interest therein, there was nothing further for the court to consider. It necessarily followed, if plaintiff was the owner of said real property at the time the defendant claims he was illegally ejected therefrom and entitled to the possession thereof, that defendant's action by cross-complaint must fail. Had the court found against plaintiff in the action to quiet title, then it would have been its duty to try the issue of ejectment under defendant's cross-complaint. But as Mr. Justice Henshaw said: 'That time never arrived,' and it was only that issue which the defendant was entitled to have tried by the jury. Under these circumstances, the trial court did not err in denying defendant's demand for a jury trial.'' See also *Peterson* v. *Peterson*, 74 Cal.App.2d 312, 321 [168 P.2d 474].)

■ The court, in the consolidated case, having found in favor of Albertson on the equitable issue of estoppel to assert the statute of frauds and that the oral contract upon which Gottlieb's claim depends did not exist, this finding was equally applicable to and binding on coplaintiff Jaffe. Nothing remained of Jaffe's first cause of action to submit to a jury. The directed verdict thereon in favor of defendant correctly followed.

■ Appellant's next contention is that the court erred in granting a nonsuit to Jaffe's second cause of action because there was substantial evidence to support a verdict thereon. This cause of action differs from his first only in that, in addition to the alleged oral contract between Gottlieb and Albertson under which he claims to be a third party beneficiary, he asserts a direct oral promise from Albertson to pay him a commission.

Jaffe concedes on this appeal that his second cause of action depends essentially upon the same facts and circumstances as does his first. These facts demonstrate that the only thing Albertson ever agreed to was to enter into a written contract with Gottlieb if all the terms of such a contract could be agreed upon. One of the oral understandings was that if a contract was made between Gottlieb and Albertson, that contract would provide for a commission to Jaffe. There is no evidence of any understanding on the part of Albertson to make a separate contract with Jaffe, either oral or written.

■■ Jaffe's second cause of action is clearly barred by the statute of frauds (Civ. Code, § 1624; Code Civ. Proc., § 1973) in the absence of estoppel. As heretofore held there is

no substantial evidence of estoppel herein. The court properly granted the motion for nonsuit as to the second cause of action.

■ Jaffe next maintains that the court erred in granting a nonsuit on his third cause of action because there was substantial evidence to support a verdict thereon in his favor.

Whereas the first and second causes of action concerned themselves with Albertson as the sole defendant, the third cause of action added the other respondents herein as defendants. The third cause of action alleges that all defendants, by combination and concerted action, with full knowledge of Jaffe's rights, wilfully, wantonly and maliciously interfered with his business relationships and contractual rights alleged in his first and second causes of action to his claimed monetary damage. He argues the evidence shows under his third cause of action that the defendants conspired to and did: (1) induce the breach by Albertson of an alleged oral contract between Albertson and Gottlieb of which Jaffe was allegedly a third party beneficiary; (2) induce the breach by Albertson of an alleged oral contract between Albertson and Jaffe, and (3) interfere with the formation of a contract between Albertson and Gottlieb or between Albertson and Jaffe.

We have held herein that the evidence is insufficient to show any oral contract as between Albertson and Gottlieb under which Jaffe could be a third party beneficiary or the existence of any oral contract between Albertson and Jaffe. We therefore now direct our attention to the third issue as to the sufficiency of the evidence to show that the defendants conspired to interfere with the formation of a contract between Albertson and Gottlieb or between Albertson and Jaffe.

The record herein discloses no substantial evidence that the defendants, or any of them conspired to, or did, interfere with any contract, the formation of any contract or any business relation with or between Albertson, Gottlieb and Jaffe.

Jaffe concedes he makes no contention that the means employed by defendants were unlawful but maintains they were unjustifiable and intentional interference.

In addition to the factual matter heretofore recited, he complains generally of the following as showing the alleged conspiracy against him. Kittle, the real estate broker representing Albertson, showed Zeiler, the broker representing American-Hawaiian, the ranch property in February 1961, some six months before Jaffe or Gottlieb evinced any interest. In May 1961, Trousdale heard the property was available,

desired to buy it, and contacted third parties but no purchase was made. In October 1961, Zeiler asked for and obtained the key to the property so Trousdale might inspect it. At this time Kittle was willing to discuss the sale of the property with Zeiler. During late November Kittle told Zeiler he could not discuss the property. Zeiler then contacted Waranch, an officer of Trousdale Construction Company, reporting to him that an offer may have been made by someone for the property and he needed to reach Trousdale. Waranch also called Kittle telling him Trousdale was interested in the property and would like to discuss it. Kittle reiterated that he was not free to do so.

At this time Trousdale was on a cruise with D. K. Ludwig, principal owner of American-Hawaiian. Ludwig mentioned he was interested in purchasing California real estate. Waranch reached Trousdale in Panama City by telephone, informing him of Zeiler's report that an offer may have been made for the Albertson ranch. Trousdale on November 30 caused a telegram to be sent to Albertson advising that he would return to California in a few days and would make a purchase proposal.

There was no other contact by Albertson or Kittle with the Trousdale or American-Hawaiian group after the November 30, 1961, telegram until either the afternoon or evening of December 4, 1961, when Zeiler called Kittle and asked him to meet with Trousdale on December 5, 1961. The only thing that happened on December 4, 1961, was that Kittle and Zeiler agreed to meet Trousdale at his office on December 5, 1961. Meanwhile there were meetings with Gottlieb on November 30, 1961, and December 4, 1961.

On December 4, Gottlieb was notified that, because of the several disagreements as to the terms and conditions of the proposed agreement of purchase, Albertson would continue to negotiate with him but would also entertain other proposals for the sale of the property.

Before meeting with Zeiler and Trousdale on December 5 Kittle obtained permission from Albertson to attend and listen to what they had to say. He was further authorized to, and he did, tell them that there was then ''no moral or legal reason'' why Albertson could not consider an offer.

There was no discussion of Gottlieb or Jaffe. The only thing that happened at the December 5, 1961, meeting was that Kittle said a $30,000,000 offer had been turned down, and Trousdale mentioned the figure of $32,000,000. Kittle reported to Peck what Trousdale had said.

Trousdale then called Ludwig, telling him that he knew of

some California property that could be bought for $32,000,000 and suggested that they buy it as partners. Ludwig refused, saying American-Hawaiian did not have partners. He then had Moerman, an officer of the corporation, talk with Trousdale.

On December 7 Zeiler told Kittle that his people, Trousdale, American-Hawaiian and Ludwig, were prepared to make an offer in excess of $30,000,000. This was relayed to Albertson and Kittle was told to get the offer in writing.

On December 8 a written offer of $32,000,000 cash was prepared by Trousdale and Moerman and delivered to Albertson. On December 9 the offer was amended to cover certain reservations required by Albertson, including that the property was being sold without warranties. The amended offer was accepted by Albertson. Gottlieb was thereupon notified of the sale.

This act of Albertson's was a repudiation of any right which Gottlieb or Jaffe might claim to have. As to Albertson this could amount to a tortious act (assuming existence of a valid right to be interfered with) only if Albertson conspired with someone else who also had knowledge of Jaffe's and Gottlieb's alleged rights, and if Albertson conspired with such other person to make the American-Hawaiian offer (the inducement) which caused Albertson to refuse to deal further with Gottlieb. There are two elements involved. Both co-conspirators must have knowledge of the plaintiffs' rights, and they must agree to do something which will interfere with such rights.

As to inducement, the evidence here discloses no agreement on the subject whatsoever. The only thing that happened was that Albertson authorized Kittle to listen to the Trousdale group. Albertson's decision to listen to others, including Trousdale, was a unilateral decision made by Albertson, and no one else, on December 4, 1961. The decision to make an offer to Albertson was a unilateral decision by the members of the Trousdale-American-Hawaiian group. There is no evidence of a conspiracy between Albertson and Kittle on the one hand, and Trousdale and American-Hawaiian on the other, to make an offer, which was the only act of inducement.

As to knowledge of Jaffe's and Gottlieb's alleged rights, the evidence discloses that the Trousdale and American-Hawaiian group did not have knowledge of any kind. In all of the contacts between the two groups there was never any mention of Jaffe or Gottlieb. The only thing that Trousdale knew was

that Kittle had "clammed up" in late November and was later willing to listen on December 5, 1961. So they asked Kittle if Albertson was in a position to accept an offer, and he said he had cleared with the lawyers and that they had said that Albertson was free to deal.

As between Albertson and Kittle, they knew of Jaffe's and Gottlieb's "rights" in the legal sense in that they were aware of the fact that they had been negotiating for a contract. But there is no evidence that Kittle and Albertson conspired or that Kittle induced Albertson either to solicit an offer from American-Hawaiian or to accept it.

Jaffe strongly relies on *Rogers* v. *Grua*, 215 Cal.App.2d 1 [30 Cal.Rptr. 39], in contending that even if no conspiracy is sufficiently shown as between Albertson and Kittle on one side and the remaining defendants on the other, such a conspiracy is shown as between Albertson and Kittle. The facts of this cited case are quite dissimilar to Jaffe's situation. There, owner Grua and a real estate broker, Hilton, were held liable for conspiracy to induce breach of plaintiff broker's valid written authorization to sell certain real property.

Rogers produced two prospective buyers and notified Grua. Grua then asked defendant Hilton, who was a friend of his and who was also a real estate broker, to deal with Rogers. The two brokers concluded a contract of sale to one of the two buyers and opened an escrow. In this escrow the broker's commission was to be shared by Rogers and Hilton. The escrow papers were sent to Grua. He executed them and told Rogers over the telephone that he was satisfied with the sale. Then the second prospective buyer came to see Hilton. Hilton negotiated a sale with the second buyer wherein Hilton would receive the entire commission and not share it with Rogers. Hilton then persuaded Grua to make the second sale so that Hilton would receive the entire commission. Thus, the situation was that the broker had not merely conveyed an offer. He had actively negotiated a sale, and in such a way as to deprive the plaintiff of the commission he had earned, and he then prevailed upon his principal to accept the second sale.

In our instant case there was no valid written authorization to sell the Albertson property upon which either Jaffe or Gottlieb might rely. There is no evidence that Kittle conspired with, or persuaded Albertson to accept the American-Hawaiian offer. Albertson and not Kittle had concluded to listen to other offers. Kittle merely followed the instructions of his principal and conveyed information coming to him. There is

no evidence that Kittle had or could have had a purpose of obtaining Jaffe's commission for himself. The evidence herein falls far short of showing any conspiracy as between Albertson and Kittle to interfere with the formation of any contract.

Appellant next complains of the ruling of the trial court that any evidence of alleged interference by respondents with Jaffe's relationship with Albertson subsequent to December 10, 1961, was irrelevant and immaterial excepting for impeaching testimony or admissions against interest. This ruling was based on the fact that the evidence established American-Hawaiian had offered in writing on December 9 to purchase the Albertson property which offer was thereupon accepted by Albertson; Gottlieb on December 10 was notified that the property had been sold to American-Hawaiian.

Jaffe filed his action on February 8, 1962. He amended his complaint three times, the third being filed on July 27, 1962. No supplemental complaint was ever filed. In none of his complaints did Jaffe make reference to facts occurring after December 10, 1961.

Jaffe's contention, that the events occurring after December 10, 1961, are material, is essentially this. At the time the Albertson-American-Hawaiian offer was made, the Trousdale and American-Hawaiian group may not have had any knowledge of Gottlieb's and Jaffe's claimed rights. However, shortly after that time they did acquire knowledge that Gottlieb claimed an interest in the property, and it was therefore permissible to show that they continued to interfere after they had knowledge. The excluded evidence which Jaffe points to, however, does not show that American-Hawaiian did interfere with Jaffe's or Gottlieb's rights after December 10, 1961. The only thing that American-Hawaiian did was to insist on standing upon its own rights. On December 9, 1961, prior to learning that Jaffe and Gottlieb laid a claim to the property, American-Hawaiian had made an offer in writing, and Albertson had made an acceptance in writing. The only thing that American-Hawaiian did after that was to persist in its own claim that it had a contract. American-Hawaiian was entitled to stand upon its own rights.

On August 29, 1962, long after American-Hawaiian had filed its enforcement suit against Albertson, that controversy was settled. Albertson did contract to sell the property to American-Hawaiian subject to Gottlieb's claim. If there was interference with the rights of Jaffe or Gottlieb by American-Hawaiian and its defendant associates it occurred on or before

December 10, 1961. We have heretofore found there was none.

The trial court, under all the circumstances here shown, was justified in exercising its discretion in limiting the evidence of alleged interference with Jaffe's relationship with Albertson to events occurring on or before December 10. The settlement negotiations and agreement between American-Hawaiian and Albertson, having taken place long after plaintiff's cause of action, if any, arose, are immaterial to the case. ▮▮▮ Jaffe's cause of action must exist at the time he files his complaint and the rights of the parties must be judged by conditions existing at the time the suit is commenced. (*Browar* v. *Paul Hardeman, Inc.*, 183 Cal.App.2d 708, 712 [7 Cal.Rptr. 231]; *Berkowitz* v. *Palm Springs etc. Co.*, 37 Cal.App.2d 249, 251 [99 P.2d 372].)

▮▮▮ As final, if minor, points of his appeal Jaffe objects to the orders of the trial court precluding him from taking certain depositions with respect to the Albertson-American-Hawaiian settlement of their case and refusing him during the trial a subpoena duces tecum for the production of that agreement or settlement.

Although exhaustive discovery proceedings, including depositions, had previously been had, Jaffe, shortly before the date of trial, noticed the taking of the depositions of Trousdale, Kittle, Zeiler, Peck and John P. McGinley, the latter being attorney for Zeiler. He specified that the scope of inquiry would be limited solely to the terms and conditions of the settlement, together with conversations and negotiations relating thereto. His asserted purpose was to elicit additional evidence to show the combination and concerted action of the parties in interfering with his contractual rights and business relations. The depositions of each of those named other than McGinley had previously been taken. Gottlieb likewise served notice of motion to reopen various depositions to inquire into settlement discussions.

The defendants promptly moved for a protective order, pointing out, among other things, the irrelevance to the issues of the matter sought, the imminence of trial and the delay such proceedings would cause. The trial court who, by reason of the earlier consolidation of the cases had supervised the discovery proceedings, granted the protective order and denied the further discovery. Jaffe thereupon petitioned the District Court of Appeal for a writ of mandate seeking abrogation of

this discovery ruling. The petition for writ of mandate was denied.

As said in *Ryan* v. *Superior Court* (186 Cal.App.2d 813, 816, 817 [9 Cal.Rptr. 147]), "One of the prime purposes of the Discovery Act is to expedite the trial of an action. . . .

"In all discovery proceedings a broad discretion is vested in the trial court in granting or refusing to grant an order directed at discovery and whatever order the trial court may make may not be disturbed in the absence of an abuse of discretion by it. (*Dowell* v. *Superior Court*, 47 Cal.2d 483, 486 [304 P.2d 1009].)"

*Heffron* v. *Los Angeles Transit Lines* (170 Cal.App.2d 709, 713 [339 P.2d 567]), cited with approval in *Greyhound Corp.* v. *Superior Court* (56 Cal.2d 355, 379 [15 Cal.Rptr. 90, 364 P.2d 266]), in upholding the exercise of his discretion by the trial court in refusing certain discovery upon a ground of tardiness and closeness to date of trial said: ". . . Without reasonable judicial control, the instruments of discovery are susceptible to abuse and may be utilized for purposes of delay, annoyance and harassment. If a reasonable control is exercised, the salutary purposes of discovery will be served, abuses will be prevented and undue interference with orderly procedures will be avoided."

In view of the determination, as herein expressed, of the other and principal issues presented on this appeal the information sought by the belated discovery proceedings and the subpoena duces tecum were relatively unimportant. As provided in *Greyhound Corp.* v. *Superior Court* (*supra*, pp. 383, 384) this is a factor to be considered by the court in exercising its discretion. The court there said: "In the exercise of its discretion the court should weigh the relative importance of the information sought against the hardship which its production might entail, and it must weigh the relative ability of the parties to obtain the information before requiring the adversary to bear the burden or cost of production, keeping in mind the statutory admonition of entering an order consistent with justice."

The prejudice claimed by appellant in the discovery proceeding and in the denial of the subpoena duces tecum is without substance and the rulings constitute no miscarriage of justice. Under these circumstances we are in agreement with the statement in *Wooldridge* v. *Mounts* (199 Cal. App.2d 620, 628, 629 [18 Cal.Rptr. 806]): "It is true nonappealable orders such as those in discovery proceedings may be reviewed on appeal after a final judgment has been entered

in the case in chief. (Code Civ. Proc., § 956; *Southern Pac. Co. v. Oppenheimer*, 54 Cal.2d 784 [8 Cal.Rptr. 657, 356 P.2d 441].) However, appellate courts are much more reluctant to overturn the judgment of a trial court after the full trial of the action because of a procedural error unless such error is so prejudicial it constitutes a miscarriage of justice. This reluctance of appellate courts is based on the well-established rule of law contained in the California Constitution, article VI, section 4½: 'No judgment shall be set aside, or new trial granted, in any case, on the ground of misdirection of the jury, or of the improper admission or rejection of evidence, or for any error as to any matter of pleading, or for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.' "

The judgment is affirmed.

Wood, P. J., and Lillie, J., concurred.

A petition for a rehearing was denied August 23, 1966, and appellant's petition for a hearing by the Supreme Court was denied October 14, 1966.