FLETCHER, Circuit Judge:
 

 The trustee appeals from a judgment holding that two brokers have allowable claims against the estate of the debtor for
 
 *445
 
 commissions based on services rendered in arranging the transfer of real property by the debtor. The trustee contends that the bankruptcy court and the bankruptcy appellate panel (BAP) erred in finding an enforceable claim for commissions, because the brokers obtained no general brokerage agreement in writing, the conditions under which commissions were to become payable under the written special contract were never satisfied, and the special contract was not validly modified by subsequent oral statements. We reverse.
 

 I
 

 The appellees are the Norm Ross Company and Eli Perlman Realty Company (Brokers), two real estate brokers doing business in San Diego, California. Debtor Eastview Estates II (Estates) is a California limited partnership in which Toddner, Ltd., is the general partner. Toddner is a California limited partnership in which New Environment Research Co. (NER) is a partner. The president of NER is Raleigh A. Kirkendall (Kirkendall).
 

 In 1975, Toddner purchased 58 acres of unimproved real property from Sweetwater Heights Investa (Sweetwater). Soon after, Toddner transferred the property to Estates, which assumed Toddner’s indebtedness to Sweetwater.
 
 [1]
 

 To meet final payments on the debt to Sweetwater that were due in late 1979, the property was put on the market in March of 1979. Kirkendall, acting on behalf of Estates, orally engaged Brokers, among other real estate agents, to find a buyer of the property at a set price ($1,254,000) and subject to certain terms. The proceeds of the sale were expected to produce sufficient cash to satisfy the Sweetwater debt. Kirk-endall told Brokers that they would receive the customary commission but only when and if a sale according to the proposed terms actually closed and Estates received the proceeds. No general brokerage agreement, authorizing Brokers to sell the property, exclusive or otherwise, was reduced to writing.
 

 By late June of 1979, Brokers had produced two offers to purchase the property, both of which ultimately proved unsuccessful. Other brokers also produced offers. The purchase agreements and escrow instructions executed as a result of each of these offers provided for the payment of commissions upon the close of escrow. Estates never paid any commissions on the basis of these offers, however, since none of the transactions closed.
 

 Brokers obtained a third offer on June 24, 1979, from Schwerin-Xinos & Associates (Associates), a civil engineering firm doing development work in Southern California. Brokers reduced the offer to writing on Brokers’ own “Real Estate Purchase Contract” form. The form contained instructions to open an escrow to close on October 1, 1979, and a statement that “[a]ll modifications ... shall be in writing signed by the parties.”
 

 Brokers then delivered the offer to Kirk-endall, who, acting for Toddner, general partner of Estates, accepted the offer on behalf of Estates on June 29, 1979. After inserting a footnote initialed by Brokers, Kirkendall indicated acceptance by signing a section located at the bottom of the form, which contained a statement of acceptance and a conditional brokerage commission agreement.
 
 [2]
 
 On July 6, 1979, Kirkendall
 
 *446
 
 executed escrow instructions based on the terms of the real estate purchase contract of June 29, 1979 (the “June 1979 purchase contract”) and the accompanying commission agreement (the “June 1979 commission agreement”). A closing date of October 1, 1979 was specified.
 

 Associates and Estates understood that Associates might experience difficulty in raising the down payment and might be unable to consummate the purchase contemplated in the June 1979 purchase contract. In light of this uncertainty, on July 11, 1979, Associates and Estates agreed to form a development/marketing partnership (Properties) in the event Associates was unable to raise the cash down payment. Under the partnership arrangement, Estates was to contribute the property to Properties while Associates was to contribute $10,000 in cash and developmental and marketing services. As Properties subdivided and sold the land, Estates was to receive the first $1,254,000, plus 10 percent interest on any unpaid portion of the $1,254,000. After that, all further receipts were to be split 50-50 between the partners.
 

 After discussing the possibility of forming a partnership, Kirkendall told Brokers, upon Brokers’ inquiry regarding the effect of the partnership alternative on the Brokers’ commissions: “You will get paid, if I get paid.” The written amendment to the escrow instructions executed on July 12, 1979, to reflect the discussions regarding the partnership option did not provide for the payment of commissions in the event the property was transferred to Properties rather than sold for cash to Associates.
 

 Despite the optional partnership agreement, both Associates and Estates sought to close the deal pursuant to the June 1979 purchase contract. During the summer and early fall of 1979, Kirkendall told Associates repeatedly that Estates needed cash and urged Associates to find additional investors so the cash sale transaction could be completed as originally planned.
 

 Associates was unable to pay the cash to close the sale under the June 1979 purchase contract. Thus, on October 1, 1979, Associates and Estates entered into partnership. Since Kirkendall did not want record title in Properties until Associates had completed its promised marketing and development work, Kirkendall did not then, or at any subsequent time, transfer title to Properties. Instead of receiving $340,000 in cash and a promissory note for $900,000 under the June 1979 purchase contract, Estates received only certain rights under the partnership. Without cash, Estates could not pay Sweetwater; Sweetwater commenced foreclosure; Estates filed for bankruptcy.
 

 In early January of 1980, five months after the Estates-Associates partnership was formed, Brokers presented Estates—
 
 not
 
 Properties- — with two new offers from third parties to purchase the property. Each offer explicitly provided for brokerage commissions to Brokers if the sale were completed. Neither of these transactions was consummated.
 

 The following October, after another broker had arranged a sale of the property to Addland Enterprises, Inc. (Addland), the bankruptcy court entered an order confirming sale of the property by Estates to Add-land for $1.9 million. The order also confirmed an award of commissions on the sale to the broker who had presented the Add-land offer. Three weeks later, in early November of 1980, Brokers (Norm Ross Company and Eli Perlman Realty Company) each filed “priority” claims for commissions against the estate in bankruptcy, relying on the June 1979 commission agreement contained in the June 1979 purchase contract between Estates and Associates.
 

 
 *447
 
 On February 9, 1981, the bankruptcy court entered an order declaring that Brokers had allowable claims against the estate. The court concluded that the June 1979 commission agreement, as modified by oral promises by Estates, constituted an enforceable commission contract based on Brokers’ services in procuring Associates, which, through the Properties partnership, became a purchaser of a one-half interest in the property. The court determined the amount of each of the claims (Ross’ and Perlman’s) to be $18,060, based on three percent of half of the value of the transferred property ($1,204,000).
 
 [3]
 

 On appeal, the BAP affirmed the bankruptcy court on the allowability of the claims, but doubled the size of each, concluding that Estates had conveyed its entire interest in the property to the partnership entity. The trustee now takes this further appeal.
 

 II
 

 We begin by examining our jurisdiction over this appeal taken from the decision of the BAP, an appellate body created pursuant to section 405(e)(2) of the Bankruptcy Reform Act of 1978 (the Reform Act) and the rules of this court.
 
 See
 
 Pub.L. No. 95-598, § 405(c)(2), 92 Stat. 2549, 2685 (1978).
 

 On June 28, 1982, the Supreme Court rendered its decision in
 
 Northern Pipeline Construction Co. v. Marathon Pipe Line Co.,
 
 holding that “the broad grant of jurisdiction to the bankruptcy courts contained in § 241(a) [of the Reform Act] is unconstitutional.” 458 U.S. 50, 102 S.Ct. 2858, 2880, 73 L.Ed.2d 598 (plurality opinion). The majority stated that since the grant of authority challenged in
 
 Marathon
 
 was not severable from the remaining grant of authority in section 241(a), no purported exercise of judicial authority by a bankruptcy court under section 241(a) was valid.
 
 Id.
 
 102 S.Ct. at 2880 n. 40 (plurality opinion);
 
 id.
 
 102 S.Ct. at 2882 (Rehnquist, J., concurring). The majority explicitly limited its holding to prospective effect, however,
 
 id.
 
 102 S.Ct. at 2880 (plurality opinion);
 
 id.
 
 102 S.Ct. at 2882 (Rehnquist, J., concurring), and stayed its judgment until October 4, 1982,
 
 id.
 
 The Court later extended the stay until December 24, 1982. -U.S.-, 103 S.Ct. 199, 200, 74 L.Ed.2d 160 (1982).
 

 In this case, the bankruptcy court entered its order on February 8, 1981. The BAP entered its original order on February 23, 1982 and a new order modifying its earlier decision on June 23, 1982, five days before the
 
 Marathon
 
 decision and well before the termination of the stay of the
 
 Marathon
 
 judgment.
 

 Even assuming that the exercise of judicial power by the bankruptcy court and by the BAP is unconstitutional under the principles set forth in
 
 Marathon,
 
 we have jurisdiction over this appeal. Because
 
 Marathon
 
 is to have only prospective effect, the decisions of both the bankruptcy court and the BAP are valid judgments.
 
 See Buckley v. Valeo,
 
 424 U.S. 1, 142, 96 S.Ct. 612, 693, 46 L.Ed.2d 659 (1976).
 

 Ill
 

 We now turn to the merits. Section 502(b)(1) of the Reform Act provides that the court “shall allow” a claim, proof of which has been filed, “except to the extent that ... such claim is unenforceable against the debtor ... under any ... applicable law.” 11 U.S.C. § 502(b)(1) (Supp. III 1979). In this case, the allowability of Brokers’ claims against the estate turns on whether they had a commission agreement enforceable against the debtor under California law.
 
 [4]
 
 We conclude that they did not.
 

 
 *448
 
 A
 

 The California Statute of Frauds states that “[a]n agreement authorizing or employing an agent, broker, or any other person to ... sell real estate ... or to procure, introduce, or find a purchaser ... of real estate ..., for compensation or a commission” is “invalid, unless the same, or some note or memorandum thereof, is in writing and subscribed by the party to be charged or by his agent.” Cal.Civ.Code § 1624(5) (West 1973).
 

 Oftentimes, a real estate broker and seller will sign a general listing agreement outlining the general terms and conditions of the broker’s employment. By virtue of its breadth, this variety of commission agreement usually entitles the broker to a commission for arranging any sale that is acceptable to the seller or for producing a buyer ready, willing, and able to purchase the property on the seller’s terms, even if the sale is never completed.
 
 See Cochran v. Ellsworth,
 
 126 Cal.App.2d 429, 439, 272 P.2d 904, 909-10 (1954).
 

 In this case, Estates did not sign a general written brokerage contract that might have encompassed a commission for a transfer of the property to Properties. Rather, as Eli Perlman, the president of Eli Perl-man Realty Co., testified, Kirkendall would sign a commission agreement only in respect to a particular offer to purchase the property.
 

 Brokers argue nonetheless that the June 1979 commission agreement accompanying the June 1979 purchase contract can be read to establish a general brokerage agreement between the parties, broad enough, at least, to cover Brokers’ efforts in arranging the transfer of the property to Properties. We disagree.
 

 We cannot read the terms of the commission agreement in the abstract. The payment of a commission is conditioned on the “completion of sale” specifically described in
 
 that
 
 particular purchase
 
 agreement
 
 and no other.
 
 See, e.g., Paulsen v. Leadbetter,
 
 267 Cal.App.2d 148, 154, 72 Cal.Rptr. 819, 821-22 (1968) (commission agreement in purchase contract for particular sale does not serve as general broker’s employment contract).
 

 Nor do the escrow instructions signed by Kirkendall in early July 1979 establish a general brokerage agreement. They also are specifically linked to the sale described in the June 1979 purchase contract.
 
 See, e.g., Sanstrum
 
 v.
 
 Gonser,
 
 140 Cal.App.2d 732, 738-39, 295 P.2d 532, 536 (1956) (commission denied where sale specified in escrow instructions did not occur because escrow instructions may not “be taken out of its context and treated as a memorandum of a general and continuing brokerage contract”).
 

 B
 

 Where a broker fails to secure a general listing agreement in writing, he must demonstrate compliance with the conditions of any written special commission agreement which may exist.
 
 Paulsen v. Leadbetter,
 
 267 Cal.App.2d 148, 154, 72 Cal.Rptr. 819, 821-22 (1968) (commission denied where no general “written employment contract” existed and sale described in purchase contract and escrow instructions not consummated);
 
 Cochran v. Ellsworth,
 
 126 Cal.App.2d 429, 439-40, 272 P.2d 904, 910 (1954) (commission denied where no “form brokerage contract” existed and escrow instructions, “specially prepared” only after negotiation, specifically provided for payment of commissions only on “consummation of the sale” and “close of escrow,” neither of which ever occurred).
 

 In this case, the only writings signed by Kirkendall on behalf of Estates upon which a basis of recovery under a special contract is asserted are the June 1979 commission agreement and the escrow instructions of July 6, 1979. Brokers argue that these documents establish a binding special
 
 *449
 
 contract covering the transfer of the property to Associates and obligating Estates to pay commissions simply for arranging the sale to Associates, regardless of whether that sale ever took place. We disagree.
 

 Both the commission agreement and the escrow instructions make commissions payable only upon certain conditions beyond the mere signing of the purchase contract and escrow instructions. These explicit conditions simply were not met in this case.
 
 [5]
 

 C
 

 Brokers further argue that even if the written commission agreement without more does not entitle them to a commission, Kirkendall orally agreed to modify the June 1979 commission agreement so that Brokers would receive a six percent commission upon the transfer of the property to Properties (instead of to Associates) and Estates’ receipt of nothing more than a partnership interest (rather than cash).
 
 [6]
 
 This alleged modification of the prior written agreement was never reduced to writing and is nowhere mentioned in the partnership documents executed by Kirkendall on July 11, 1979, or in the alternative escrow instructions executed on July 12, 1979. The bankruptcy court never determined whether an oral agreement to modify the written June 1979 commissions agreement took place. Nevertheless, the BAP found such an oral agreement implicit in the bankruptcy court’s decision. Even were we to assume that there was an oral modification, such an oral modification is unenforceable in this case.
 

 First, the June 1979 commission agreement, the only document to which Brokers point as a written commission agreement that was later orally modified, itself specifically prohibits oral modifications. To be sure, the provision prohibiting oral changes in the contract lies not directly in the commission agreement but in the June 1979 purchase contract. Yet neither logic nor fairness supports reading the prohibition not to apply to Brokers, since Brokers
 
 themselves
 
 provided the form and since the June 1979 commission agreement depends on the accompanying real estate purchase contract in other significant ways for its scope and meaning.
 

 Second, and more importantly, even if the June 1979 commission agreement were not limited by its terms to written modifications, California law permits the modification of a written contract within the ambit of the Statute of Frauds by an oral agreement only to the extent that the oral agree
 
 *450
 
 ment has been performed by the parties.
 
 [7]
 
 Cal.Civ.Code § 1698(b) (West Supp.1983);
 
 see, e.g., Coldwell, Banker & Co. v. Pepper Tree Office Center Associates,
 
 106 Cal.App.3d 272, 279,165 Cal.Rptr. 51, 55 (1980). That did not happen here.
 

 The oral commission agreement has not been executed by the parties, since Estates has obviously not paid the commissions allegedly promised under the oral modification. The alleged consummation of the partnership — and thus the execution of the partnership agreement — are not relevant to whether the orally modified commission agreement has been executed. The “executed” contract to which section 1698(b) refers is the agreement asserted to have been orally modified and not some other contract which may have led to the request for oral modification.
 

 Section 1698(b) was intended to protect a party from liability under the earlier written agreement where
 
 both
 
 parties have performed under the terms of the orally modified
 
 agreement
 
 — not to eviscerate the Statute of Frauds by permitting a party to demand payment under an unexecuted oral agreement where the defendant seeks to stand on the written agreement.
 
 See, e.g., Waldteufel v. Sailor,
 
 62 Cal.App.2d 577, 581, 144 P.2d 894, 895-96 (1944) (percentage commission based on written commission contract denied where seller had fully performed orally modified commission contract by making payment based on terms and conditions of oral modification);
 
 Coldwell, Banker,
 
 106 Cal.App.3d at 56, 165 Cal.Rptr. at 56 (commission based on written commission contract denied where seller “performed fully” his obligation under oral modification by refusing to use broker’s services under the written agreement
 
 and
 
 broker had “performed fully” its obligations under oral modification by failing to seek further buyers).
 

 D
 

 Finally, Brokers argue that the Statute of Frauds should not be used to deprive them of the benefit of the bargain. In California, under appropriate circumstances, the doctrine of equitable estoppel can, in appropriate circumstances, prevent a party from asserting the Statute of Frauds.
 
 See Monarco v. Lo Greco,
 
 35 Cal.2d 621, 623-24, 220 P.2d 737, 739-40 (1950) (en banc). Es-toppel will normally be invoked to prevent unconscionable injury or unjust enrichment.
 
 Id.
 

 However, the California courts have been extremely reluctant to invoke equitable estoppel to circumvent the requirements of the Statute of Frauds, partic
 
 *451
 
 ularly in real estate transactions where the statute’s protections are long standing and important.
 
 See, e.g., Cowing v. Wofford,
 
 68 Cal.App. 538, 543, 229 P. 883, 884 (1924) (§ 1624 was “designed to protect owners of real property against unfounded claims of brokers which could be prosecuted with facility prior to [its] enactment”). Brokers are presumed to know the requirements of the Statute of Frauds and thus cannot be said to justifiably rely on oral promises.
 
 See, e.g., Pacific Southwest Development Corp. v. Western Pacific R.R. Co.,
 
 47 Cal.2d 62, 70, 301 P.2d 825, 831 (1956) (en banc). We recognize that, on rare occasion, California courts have allowed a broker to invoke equitable estoppel.
 
 See LeBlond v. Wolfe,
 
 83 Cal.App.2d 282, 287, 188 P.2d 278, 281 (1948). We have examined the facts before us to determine whether they compel equitable estoppel. We are convinced that they do not.
 

 First, whatever actions Brokers took in reliance on the alleged oral promise by Kirkendall do not amount to such unconscionable injury as to justify invoking equitable estoppel. Brokers worked to sell the property but they never produced a purchaser with adequate cash. To find unconscionable injury here would be to have the exception swallow the rule of the Statute of Frauds.
 
 See Pacific Southwest Development,
 
 47 Cal.2d at 70, 301 P.2d at 830-31 (1956) (“[t]he fact that [broker] rendered services and conducted unsuccessful negotiations ... does not constitute a change of practice to [broker’s] detriment”).
 

 Second, Estates was not unjustly enriched by Brokers’ efforts. Estates engaged Brokers to find a buyer who had cash. Brokers never did so, even though six months after the putative sale of the property to Properties Brokers were still trying. Introducing a seller to a buyer whose inability to raise the cash urgently needed by the seller eventually forces the seller into bankruptcy is a benefit for which neither equity nor the law compel a reward, absent a clear written agreement otherwise. This is particularly true in this case where another broker a scant six months later was able to find a ready, willing, and able purchaser of the property for 150 percent of the price Brokers sought.
 
 See Jaffe v. Albertson Co.,
 
 243 Cal.App.2d 592, 604, 53 Cal.Rptr. 25, 33 (1966) (no justification for equitable estop-pel on the ground of unjust enrichment because broker’s efforts did not lead to sale);
 
 cf. Zelkowitz v. Tobin,
 
 108 Cal.App.2d 69, 71, 238 P.2d 19, 20 (1951) (commission denied where general brokerage contract conditioned payment on “sale or exchange” effected by broker, since property was not sold or exchanged but rather merely transferred to a joint adventure of which seller was one partner).
 

 IV
 

 The June 1979 commission agreement upon which Brokers have in large part based their claims entitles the prevailing party to “reasonable attorneys’ fees and costs” arising out of “any action between Brokers and Seller arising out of this agreement.” Since we hold that the Brokers’ claims must be denied, the Seller is the prevailing party on the issue whether Estates is obligated to pay commissions to roker under that agreement. California law explicitly authorizes parties to a contract to agree as to the payment of attorneys fees arising out of contract disputes. Cal.Civ.Code § 1717 (West Supp.1983). We conclude that Estates is entitled to reasonable fees and costs from Brokers for all expenses incurred in the proceedings below and on this appeal.
 
 [8]
 

 See In re Sparkman,
 
 703 F.2d 1097, 1100 (9th Cir.1983) (bankruptcy estate entitled to fees under contrac
 
 *452
 
 tual fees provision as authorized by Cal.Civ. Code § 1717).
 

 V
 

 We reverse the judgment of the BAP and remand with instructions to reverse the judgment of the bankruptcy court. Estates is entitled to reasonable attorneys’ fees and costs incurred in the proceedings below and on this appeal. REVERSED.
 

 [1]
 

 . While from 1975 onward Estates was the equitable owner of the property, a grant deed conveying the property from Toddner to Estates was not recorded until October 1, 1979.
 

 [2]
 

 . As footnoted, the section reads:
 

 ACCEPTANCE
 

 The undersigned Seller accepts and agrees to sell the property on the above terms and conditions. Seller has employed THE NORM ROSS CO, & ELI PERLMAN CO. 50/50 as Broker(s) and agrees to pay for services the sum of Seventy five thousand two hundred forty Dollars ($75,240.00), payable as follows,* (a) On recordation of the deed or other evidence of title, or (b) if completion of sale is prevented by default of Seller, upon Seller’s default or (c) if completion of sale is prevented by default of Buyer, only if and when Seller collects damages from Buyer, by suit or otherwise and then in an amount not less than one-half of the damages recovered, but not to exceed the above fee, after first deducting title and escrow expenses and the
 
 *446
 
 expenses of collection, if any. In any action between Broker and Seller arising out of this agreement, the prevailing party shall be entitled to reasonable attorneys’ fees and costs. The undersigned acknowledges receipt of a copy and authorizes Broker(s) to deliver a signed copy to Buyer.
 

 * TO BE PAID IN SAME RATE AS SELLER’S CASH RECEIVED IS TO TOTAL PRICE.
 

 Seller: Toddner, Ltd.
 

 Seller by: Raleigh A. Kirkendall
 

 [3]
 

 . The bankruptcy court excluded from the value of the property a lot valued at $50,000 that was purportedly not transferred to Properties. The court then credited Brokers with the sale of only one-half of the remaining property on the ground that Estates, as partner in Properties, retained a one-half interest in the property.
 

 [4]
 

 . Neither party challenges the apparent conclusion of the bankruptcy court that the applicable law for purposes of determining the enforceability of these two claims for brokers’ commis
 
 *448
 
 sions, and hence the allowability of the claims under 11 U.S.C. § 502(b)(1), is that of the State of California, since the claim is based on services rendered in California in relation to the sale of California real property.
 

 [5]
 

 . Associates never made the $350,000 down payment and the escrow never closed; the completion of the sale to Associates was prevented not by a default of Estates but by the failure of Associates to raise the necessary cash; there is no contention that Estates ever collected damages from Associates for its failure to go through with the deal embodied in the June 1979 purchase contract. Under these circumstances, no commissions ever became payable under the special commission agreement accompanying the June 1979 purchase contract.
 
 See, e.g., Cannon v. Selmser,
 
 85 Cal.App. 783, 784-85, 260 P. 332, 332-33 (1927) (commissions denied where commissions contract provided that commissions were “to be paid ... when the [buyer] makes his first payment of $2,000,” since the buyer never made the $2,000 payment).
 

 Nor do the escrow instructions executed by Kirkendall a week later provide a basis of recovery by Brokers for arranging the sale to Associates that never took place. The escrow instructions required the escrow established pursuant to the June 1979 purchase contract to close before Brokers were to receive any money at all. Since the escrow did not close, Brokers cannot recover based on this memorandum.
 
 See, e.g., Billings v. Rexford Park Apartments,
 
 244 Cal.App.2d 317, 322, 52 Cal.Rptr. 914, 917 (1966);
 
 Sanstrum v. Gonser,
 
 140 Cal.App.2d 732, 738-39, 295 P.2d 532, 536 (1956) (commission denied where only written memo-randa satisfying Statute of Frauds were escrow instructions ordering payment of commission based on consummation of sale on “express terms specified,” where the specified sale did not occur).
 

 [6]
 

 . Ross and Perlman testified that they questioned Kirkendall at the meeting on July 11, 1979, regarding commissions in the event of formation of the partnership. This testimony indicates that they did not expect the June 1979 commission agreement or the escrow instructions of July 6, 1979, alone to entitle them to commissions for the transfer of the property to Properties.
 

 [7]
 

 . Section 1698, which sets forth several means by which written agreements may be altered, states in full:
 

 (a) A contract in writing may be modified by a contract in writing.
 

 (b) A contract in writing may be modified by an oral agreement to the extent that the oral agreement is executed by the parties.
 

 (c) Unless the contract otherwise expressly provides, a contract in writing may be modified by an oral agreement supported by new consideration. The statute of frauds (Section 1624) is required to be satisfied if the contract as modified is within its provision.
 

 (d) Nothing in this section precludes in an appropriate case the application of rules of law concerning estoppel, oral novation and substitution of a new agreement, recission of a written contract by an oral agreement, waiver of a provision of a written contract, or oral independent collateral contracts.
 

 Cal.Civ.Code § 1698 (West Supp.1983).
 

 While § 1698 applies to contracts both within and without the strictures of the Statute of Frauds, it in no way vitiates the independent force and effect of the Statute on contracts within its ambit. Subsection (a), implicitly, and subsection (c), explicitly, each demand compliance with the writing requirement of the Statute. Moreover, subsection (b) merely codifies a long-standing exception to the Statute.
 
 See
 
 1 B. Witkin,
 
 Summary of California Law
 
 § 246 (1973). Finally, subsection (d), by its terms, does not attempt to authorize oral modifications, but it would, in any event, allow oral modifications of contracts within the Statute only where the “rules of law” governing application of the Statute make the validity of an oral modification “appropriate.”
 

 Thus, in this case, where the contract falls within the Statute and the modification was not reduced to writing, only subsection (b) of § 1698 could arguably authorize a modification, for subsections (a) and (c) are inapplicable to oral modifications. We do, however, discuss the possible applicability of estoppel rules and the like
 
 infra
 
 in Part III(D).
 

 [8]
 

 . The Brokers argue that because certain persons, with the approval of the bankruptcy court, have agreed to bear all litigation expenses of the appeal to this court if the trustee should prevail, the trustee should not receive an award of those costs and fees attributable to this appeal under the June 1979 commissions agreement since he is under no personal obligation to pay those expenses. We disagree. The extent to which the costs and fees of the trustee’s appeal have been assumed by others affects only the rights of those third parties to recover against the trustee and not the obligation of Brokers under the June 1979 commission agreement to pay the trustee for those costs and fees.